# EXHIBIT F

**DeSantis Vincent**                                                8/16/2017

(Pages 14 to 17)

---

**14**

1  to the paving, responsible for sidewalk
2  sweeps -- I mean, the whole aspect of DPW, I've
3  been involved in.
4      Q.   Since 1991?
5      A.   I worked my way up to foreman doing
6  all of those things and then I became foreman in
7  1991.
8      Q.   Okay.  So just so I'm clear, from
9  1985 to 1991, you were a skilled laborer?
10     A.   Right.  Involved in road
11  construction, sidewalk construction, sewer
12  construction.
13     Q.   And also involved in snow?
14     A.   And also involved in snow, as a
15  plow operator at the time.
16     Q.   And did you have a job description
17  in that era that described what you were doing,
18  from '85 to '91?
19     A.   Yes, there was a job description I
20  wrote in for, yes.
21     Q.   Okay.  From '85 to '91, was there
22  any divide between snow type of DPW activities
23  and road construction, that type of DPW work?
24     A.   I'm not sure what you mean by

---

**15**

1  divide.
2      Q.   Was there a certain class of people
3  that always did snow in '85 to '91 and not other
4  activities?
5      A.   No, everybody did everything.
6      Q.   Okay.  Now, in '91 your title
7  became --
8      A.   Streets and engineering foreman.
9      Q.   And how long did you have that
10  title for?
11     A.   Until 2001 when I took the position
12  at West Springfield.
13     Q.   Okay.  And as a streets and
14  engineer foreman, did you similarly have
15  activities involving snow as well as streets and
16  all other activities that the DPW did?
17     A.   Yes.
18     Q.   Did you have a job description
19  then?
20     A.   Yes.
21     Q.   Okay.  And in 2001, you left to go
22  to West Springfield, correct?
23     A.   Correct.
24     Q.   And you stayed there from 2001 to

---

**16**

1  2013?
2      A.   Correct.
3      Q.   And then you left there in 2013 and
4  that's when you came back to Springfield?
5      A.   Yes.
6      Q.   And you came back in October of
7  2013?
8      A.   Yes, I did.
9      Q.   And you came back as the deputy
10  director of operations for the Springfield DPW?
11     A.   Correct.
12     Q.   And was there a job description for
13  that title as well?
14     A.   Yes, there was.  It was -- I
15  applied online for it, it was posted in the
16  City's website.
17     Q.   Okay.  And that's the same title
18  you currently hold, correct?
19     A.   Correct.
20     Q.   Who is your boss currently?
21     A.   Chris Cignoli, C-I-G-N-O-L-I.
22     Q.   And how long has Chris been your
23  boss?
24     A.   He became director in 2014.

---

**17**

1      Q.   And who was your boss before 2014?
2      A.   Al Chwalek, C-H-W-A-L-E-K, was the
3  director at the time.
4      Q.   And Chris' and Al's title, were
5  they the same?
6      A.   Chris is director of Springfield
7  DPW.
8      Q.   Do you know how long Mr. Chwalek
9  performed the job he was in?
10     A.   I believe he was there seventeen
11  years.
12     Q.   And he's no longer with the City?
13     A.   He retired.
14     Q.   Do you know where he retired to, is
15  he still in the area?
16     A.   Yes, he is.
17     Q.   Do you happen to know where he
18  lives?
19     A.   He lives on Forest Hills.  I don't
20  know the address, but Forest Hills in
21  Springfield.
22     Q.   Do you know his wife's name?
23     A.   No, I don't.
24     Q.   Do you know if he's married?

---

**DeSantis Vincent**                                    **8/16/2017**

(Pages 66 to 69)

66

1   a storm?
2       A.    Yes.
3       Q.    Meaning the primary list is the
4   people who get called in the event of a storm?
5       A.    Yes.
6       Q.    And these are the people who would
7   get the Robo call?
8       A.    Yes.
9       Q.    And this is the list that was in
10  existence, with the exception of your name, when
11  you came into the DPW in 2013?
12      A.    Yes.
13      Q.    Okay.  And then the people that you
14  mentioned -- can I just -- I just need to get
15  this for the record again --
16      A.    Yes.
17          MS. BRODEUR-McGAN:  Off the
18  record.
19  (Off-record conference)
20          MS. BRODEUR-McGAN:  Back on
21  the record.
22      Q.    (By Ms. Brodeur-McGan)  I'm going
23  to repeat the question because I want to make
24  sure that I have the complete list of those

67

1   people who are not snow inspectors that appear
2   on Exhibit 2's primary list.  If you could
3   repeat those names for me?
4       A.    Myself, Jacob Smith, Bob Houldson,
5   Steve Beem, Scott Donelon, Greg Superneau, and
6   Steve Jankiewicz.
7       Q.    So that's seven names you gave me?
8       A.    Right.
9       Q.    So of the 26 names that appear on
10  the primary list of Exhibit 2, 7 of them are not
11  actually snow inspectors?
12      A.    Correct.
13      Q.    Did you perform as a snow inspector
14  after you came back in 2013 for the DPW?
15      A.    No, I did not.
16      Q.    At some point, did Mr. Seldin
17  become on the primary list for snow inspectors?
18      A.    He was a snow inspector and he was
19  promoted to solid waste assistant manager, so he
20  came off the primary list.
21      Q.    Do you know when he was promoted?
22      A.    2015, because he was still on the
23  main list here in '15.
24      Q.    So was he a snow inspector in 2013?

68

1       A.    I apologize, yes, he was.  I keep
2   thinking about now.  He's not a snow inspector
3   now.
4       Q.    Okay.  So we're going to revise the
5   list again.
6       A.    Okay.
7       Q.    So Mr. Seldin, in 2013, was a snow
8   inspector?
9       A.    He was.
10      Q.    Which department did he work in in
11  2013?
12      A.    He was in solid waste still at the
13  time.
14      Q.    Okay.  And just again, I did not
15  see an application for Mr. Seldin.
16      A.    Okay.
17      Q.    So can you tell me how it is that
18  he got on the list of primary inspectors?
19      A.    No, I can't.
20      Q.    And Bob -- where does Bob work?
21      A.    Bob is IT.
22      Q.    And was he ever a snow inspector
23  that you can recall?
24      A.    No.

69

1       Q.    Okay.  So of the 26 names, six of
2   them are not snow inspectors.  So we have 20
3   names as snow inspectors that were primary
4   inspectors in 2013?
5       A.    Correct.
6       Q.    So can you explain, if there were
7   20 listed snow inspectors when you came in in
8   2013, why did you need to post for new ones?
9       A.    I don't know why.  That's a program
10  I stopped.
11      Q.    Okay.  Tell me about when you
12  stopped the program.
13      A.    At the end of the 13/14 season I
14  stopped it.
15      Q.    At the end of the 13/14 snow
16  season?
17      A.    Yes.
18      Q.    You stopped what?
19      A.    The write-in for snow inspectors.
20      Q.    Is that because you didn't need new
21  snow inspectors?
22      A.    Not necessarily, no, it was because
23  I was getting applications from outside the
24  department of people who had no base knowledge

**DeSantis Vincent**                                    **8/16/2017**

134

1   not he wanted to do the snow inspector duties?
2       A.   We talked about it during his
3   interview, yes.
4       Q.   And what did he say?
5       A.   He said he was willing to be a snow
6   inspector.
7       Q.   Okay.  But willing to and wanting
8   to are two separate things.  So did he express
9   to you a desire for him to want to do those
10  duties?
11      A.   He didn't express a negative
12  reaction to it.
13      Q.   Okay.  But you didn't hear any
14  words that sounded like, I want to do the snow
15  inspector responsibilities?
16      A.   Not to that -- no, not that exact
17  wording.
18      Q.   I'm trying to get a sense of the
19  reality of the conversation you had with
20  Mr. Williamson, and it's fair to say that you
21  told him he has to do this?
22      A.   I put it in the job description as
23  performing.
24      Q.   Okay.  So you said you put it in

135

1   the job description.  You actually added to the
2   job description for foreman for DPW?
3       A.   Yes.
4       Q.   When do you think you first edited
5   the foreman job description?
6       A.   He probably was the first, because
7   Mr. Sumares was the first foreman to retire
8   under my watch.
9       (Time stamped at 1:55 p.m.)
10      MS. BRODEUR-McGAN:  Please
11  mark that question.
12      (Question marked in Index)
13      MS. BRODEUR-McGAN:  I'm going
14  to ask that you produce the job
15  description for foreman that you actually
16  drafted, that you just referenced in this
17  deposition, okay?
18      Q.   (By Ms. Brodeur-McGan)  So going
19  back to -- well, actually, let's look at this
20  document while we have it in front of us, Bates
21  Stamp 359.  This document does not have
22  Ms. Williams on the document as a backup,
23  correct?
24      A.   Spare inspector, but not under the

136

1   term backup.
2       Q.   And if Ms. Williams had been listed
3   as a backup inspector, in fact, in the previous
4   year, which is listed on 358, correct?
5       A.   Yes.
6       Q.   Okay.  So just focusing on how
7   Ms. Williams got removed from document 359 as a
8   back up, if you could tell me how that happened?
9       A.   Yes.  She was working with George
10  Larue, who is number -- the 11th name down on
11  357.
12      Q.   Okay.  And that's relevant because?
13      A.   Because he was training her, and
14  when I asked him how she was doing, he told me
15  she wasn't doing what she needed to do.
16      Q.   During training?
17      A.   Yes.  She was pretty much there to
18  be there and didn't care much about what was
19  happening, that's what I was told.
20      Q.   And when were you told that?
21      A.   After the snowstorm.  After he was
22  telling me he was getting ready to retire.
23      Q.   And when was that?
24      A.   After that season also.

137

1       Q.   So when you're saying that season,
2   which season?
3       A.   The 13/14 season.  He retired in
4   '14.
5       Q.   And did you -- the position
6   statement that was filed with the MCAD that we
7   looked at earlier, Exhibit 4, correct?
8       A.   Yes.
9       Q.   Nowhere in here does it say that
10  Mr. Larue had any issues with the training of
11  Ms. Williams, is that fair to say?
12      A.   That's fair to say.
13      Q.   And is it also fair to say that in
14  Exhibit 4, the document that was given to the
15  Commission, said that Mr. Larue was out for an
16  extended period of time and could not train
17  Ms. Williams?
18      A.   No.
19      Q.   Does that ring any bells?
20      A.   No.
21      Q.   Okay.  Did you ever tell
22  Ms. Williams that Mr. Larue, who was getting
23  ready to retire, had issues with the training of
24  Ms. Williams?

Springfield
413.732.1157
REAL TIME COURT REPORTING
schedule@realtimereporting.net
35
Worcester
508.767.1157

**DeSantis Vincent**                                                    **8/16/2017**

138

1   A.    No.
2   Q.    Did anybody ever tell her that?
3   A.    No.
4   Q.    Why?
5   A.    I don't know.
6   Q.    Were you made aware that
7   Ms. Williams brought a MCAD complaint?
8   A.    Yes.
9   Q.    Did she actually tell you that she
10  believed she was being discriminated against?
11  A.    Yes.
12  Q.    And did you have a face-to-face
13  conversation with her about it?
14  A.    I told her that she needed more
15  training.
16  Q.    I didn't hear that. I'm sorry?
17  A.    She needed more training. She also
18  was not going to get called every storm, backups
19  do not always get called, and I explained that
20  to her. And she wanted to be a primary and I
21  said, you're not ready.
22  Q.    Did you ever tell her that you were
23  going to remove her from the list as a backup
24  because Mr. Larue had issues with things that

139

1   she did while training?
2   A.    I removed a lot of people from the
3   backup list. There's a reason for it, and I'm
4   going to tell you why.
5   Q.    You have to answer my question.
6        MS. deSOUSA: You have to let
7   her ask the questions.
8        THE WITNESS: I get it.
9        MS. deSOUSA: You're trying to
10  answer a question she hasn't asked you
11  yet.
12       THE WITNESS: I have a hard
13  time with certain -- I'm used to being in
14  charge. I'm sorry.
15  Q.    (By Ms. Brodeur-McGan) So my
16  question was, you were having a face-to-face
17  conversation with her about her concerns, and
18  specifically discrimination, correct?
19  A.    Yes.
20  Q.    And you did not tell her that
21  Mr. Larue had some concerns about her
22  performance while training?
23  A.    I didn't say that. I said she
24  needed more training to be a primary.

140

1   Q.    Okay. But you gave me some more
2   background of what Mr. Larue said about her.
3   A.    That's what he told me. I asked
4   him to put it in writing and he never did.
5   Q.    Okay. Well, you were his
6   supervisor, right?
7   A.    Yes.
8   Q.    So why didn't you make him put it
9   in writing?
10  A.    When I told him to put it in
11  writing, he said he would, and the next thing I
12  know he's retiring. It wasn't like I had much
13  of a chance to get after him.
14  Q.    Okay. So you personally removed
15  Ms. Williams from the backup list as a backup
16  inspector?
17  A.    Yes.
18  Q.    And you did that the year that it
19  came in effect, which was which year?
20  A.    '15.
21  Q.    So that would have been the 2015 to
22  2016 snow year?
23  A.    Yes.
24  Q.    Listed on Bates Stamp 359?

141

1        MS. deSOUSA: So I have 359 as
2   14 to 15.
3   A.    Yes. Remember I told you that was
4   a typo on the top.
5   Q.    But I thought you said it was 15 to
6   16?
7   A.    I have 2015/16 here. I got
8   confused because I didn't have this paper in
9   front of me, and I was kind of trying to figure
10  out all of these graphs.
11       MS. deSOUSA: Which makes
12  sense, because 358 is FY 14, so that's 13
13  to 14, and 359 would be 14 to 15, and then
14  360 is 15/16.
15  Q.    Okay. Well, I'm going to have the
16  witness go through each number and say what he
17  thinks it is, because I had it backwards. In
18  fact, I asked him --
19       MS. deSOUSA: I know, there's
20  a typo.
21  A.    And because I didn't have this one
22  in front of me, I got a little messed up.
23  Q.    So because you did not have 357 in
24  front of you, you got messed up?

**DeSantis Vincent**                                    **8/16/2017**

170

1    A.    He was out, okay, but he was back
2  by January, which was the same season.
3    Q.    So on page 5 of 7, I'm going to
4  read this, it says, "He felt that she needed
5  more training before she could go out on her
6  own. That training took place and was completed
7  when the complainant and Mr. Larue went out,
8  together in response to snowfall on January 3,
9  2014."
10   A.    Right.
11   Q.    Did I read that accurately?
12   A.    Yes.
13   Q.    Was her training completed on
14 January 3, 2014?
15   A.    Not that I felt, no.
16   Q.    Okay. But this document says her
17 training was completed on January 3, 2014,
18 correct?
19   A.    That's what it says, yes.
20   Q.    Do you have any reason to believe
21 that it's inaccurate?
22   A.    I might have misread it. I don't
23 know.
24   Q.    Okay. Well, sitting here today --

171

1         MS. deSOUSA: I'm going to ask
2    that he be allowed to read the entire
3    paragraph.
4    A.    You're assuming that completed
5  means that she was fully trained. That's not
6  what that says, from my look. It says training
7  took place and was completed on this snowstorm.
8  That doesn't mean that her training was
9  completed, that particular day was. That's how
10 I read it.
11   Q.    So the sentence that says that the
12 training took place and was completed when the
13 complainant and Mr. Larue went out together in
14 response to snowfall on January 3, 2014, does
15 not mean that her training was completed on
16 January 3, 2014?
17   A.    That's how I read it.
18   Q.    Okay. So was there additional
19 training that she had after January 3, 2014 that
20 you were aware of?
21   A.    February 14, 2014.
22   Q.    Okay. And do you know who did
23 that?
24   A.    Mr. Larue.

172

1    Q.    Okay. And do you know if she had
2  additional training other than that?
3    A.    No. She actually had to stay on
4  that on her own when he went home. It was a
5  double day storm, and he was probably in his
6  sixties, and he couldn't keep going, so --
7    Q.    Okay. So she actually performed
8  the role of an inspector?
9    A.    She was there, she was out there.
10   Q.    Doing the job?
11   A.    Not adequately, no.
12   Q.    Okay. And you know it was not
13 adequate because --
14   A.    Because I went through the section
15 when she said she was done and signed out all
16 her trucks, and it was a disaster, that's how.
17   Q.    And is there any documentation that
18 memorialized that, you said you went through her
19 section and --
20   A.    No. No, there was no
21 documentation. That's not how I do things, I
22 guess.
23   Q.    Did you share with Ms. Williams
24 that her section was a disaster?

173

1    A.    No. I just sent my guys out, the
2  other guys out, and just had it cleaned up.
3  Because I got -- you know, when someone sees
4  that and all the complaints, then I have to go
5  down to the mayor's office and answer to him, so
6  I just had it taken care of. That's how I dealt
7  with it.
8    Q.    Okay, had it cleaned up. She
9  wasn't not plowing, she was inspecting?
10   A.    Right. But she had sent all the
11 trucks home, so there was no one to finish
12 cleaning it up.
13   Q.    Okay. So -- and this was which
14 storm?
15   A.    The 14/15, Valentine's Day.
16   Q.    February?
17   A.    February, yes.
18   Q.    Year? February 14, 2014?
19   A.    Correct.
20   Q.    And again, there's nothing in the
21 MCAD documentation that says this, correct?
22   A.    No.
23         MS. deSOUSA: Well, other than
24    what he's reading from.

DeSantis Vincent                                    8/16/2017

---

174

1    Q.    (By Ms. Brodeur-McGan) Let me
2   rephrase this. There's nothing in the
3   documentation that was given to the MCAD that
4   memorialized that you inspected Ms. Williams'
5   inspection work after the storm of February 14,
6   2014 and you felt she had done a poor job?
7    A.    Correct. They didn't ask me that.
8   I responded to the questions they asked me.
9    Q.    Okay. So did you remove
10  Ms. Williams as an inspector because she had
11  done a poor job?
12   A.    No, I removed her because I was
13  trying to get people with a base skill back into
14  the system like it used to be. People that knew
15  the roads, people that deal with vendors, people
16  that deal with contractors, people that deal
17  with complaints, people that deal with resident
18  complaints.
19   Q.    And how did you accomplish that?
20   A.    By going with foremen, working
21  foremen, code enforcers who have to deal with
22  irate people every day, who know the streets
23  better than anybody, people that are always
24  there. That's how I went by.

---

175

1    Q.    And again, you did not change the
2   snow inspector job description to reflect that?
3    A.    No.
4    Q.    But you did change the foreman
5   description to reflect that foremen had to be
6   snow inspectors?
7    A.    Correct.
8    Q.    Okay.
9    A.    I didn't change the inspector job
10  description because I never posted it again. If
11  I had to post it again, I would have changed it.
12   Q.    Okay. But you did hire for it?
13   A.    I hired -- all the guys that -- all
14  the people that I just mentioned, code
15  enforcement, they were all on here already. I
16  didn't hire anybody.
17   Q.    And they are all guys, right?
18   A.    That's neither here nor there.
19   Q.    Well, actually, this is a gender
20  discrimination.
21   A.    I understand that. But if I had --
22       MS. deSOUSA: Yes, they are
23  all men. We'll stipulate that for the
24  record.

---

176

1        THE WITNESS: I'm just tired.
2        MS. deSOUSA: I know, it's a
3   long day.
4    Q.    (By Ms. Brodeur-McGan) So the
5   persons that you hired -- you did hire people to
6   do snow inspectors -- to be a snow inspector,
7   additional people who were not originally on the
8   list when you took over in 2013, correct?
9    A.    Did I hire people, no.
10   Q.    Well, you've made people perform
11  the function of snow inspector after you came in
12  in 2013, correct?
13   A.    Yes.
14   Q.    And you were involved in some of
15  that decision making?
16   A.    Yes.
17   Q.    You've already testified to some of
18  your thought process?
19   A.    Yes.
20   Q.    And some of the persons that you
21  added to make them perform the function of snow
22  inspectors, one you told me was Mr. Ed
23  Williamson. Who else did you add to the mix, or
24  to the list?

---

177

1    A.    I added Connor Knightly, Luca
2   Mineo, Tyrone Holt.
3    Q.    And who else?
4    A.    Nobody.
5    Q.    And when did you add them?
6    A.    After the 2014 season.
7    Q.    So after 2014/15 snow season?
8    A.    Hang on. At different times. A
9   couple of them were -- Luca and Connor were
10  2014/15. Tyrone was not until 2015/16, and
11  Eddie was right after Mr. Sumares retired in
12  2014.
13   Q.    And they had to be trained?
14   A.    Yes.
15   Q.    And you had to pay them to train?
16   A.    Yes.
17   Q.    Okay. Did you ever consider
18  training Jean Williams properly to do the
19  function of snow inspector?
20   A.    No.
21   Q.    Why not?
22   A.    I just didn't.
23   Q.    Okay. And the list on 363 of
24  people that were trained, it says, trained as

---