# EXHIBIT I

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JEAN WILLIAMS, on behalf of herself and all similarly situated individuals,
                Plaintiff

v.

CITY OF SPRINGFIELD DEPARTMENT OF PUBLIC WORKS,
                Defendant

C.A. NO.: 3:16CV30179-MGM

**AFFIDAVIT OF LISA BRODEUR-MCGAN**
**In Support Of Plaintiff's Opposition To Defendant's Motion For Summary Judgment**

    I, Lisa Brodeur-McGan, making this Affidavit under the pains and penalties of perjury, state that the statements made below are based on my own knowledge, or upon information and belief.

1) I am a member of and in good standing with the bar of this court as well as the Commonwealth of Massachusetts, and am principal of the law firm Brodeur-McGan, P.C., in Springfield, Massachusetts.

2) I represent Plaintiff Jean Williams in the above-captioned case.

3) I have attached as exhibits to Plaintiff's Opposition to Defendant's Motion for Summary Judgment the discovery materials produced by Defendant in this case.

4) Specifically, Exhibits O-V, X, Y, LL and MM are true and accurate copies of documents produced by Defendant in discovery in this federal action

5) Attached as Exhibit W is a true and accurate copy of the Answer and Position Statement with attachments filed by Respondent/Defendant City filed at the Massachusetts Commission against Discrimination.

6) Plaintiff Williams propounded discovery requests upon Defendant, including interrogatories and requests for production of documents.

7) Attached as Exhibits BB, DD, and HH, II, and JJ are certain of the City's answers to interrogatories relevant to the names, identities, and work history of the snow route inspectors for relevant years.

1

8) In Exhibits BB and DD in Interrogatory Number 4, Plaintiff requested the names and identities of Defendant's snow route inspectors for relevant years and about training records for same.

9) Instead of answering these questions, Defendant attached documents. *See Ex. BB, DD*.

10) Plaintiff's counsel did not believe the attached documents answered the interrogatory request, which was critical to Plaintiff's claims of gender discrimination.

11) Further, the attached documents were inconsistent with documents the City had provided to the MCAD in its position statement and also inconsistent with the statement made by defense counsel in open court that the snow plow program had been "disbanded." *See Ex. W*.

12) Plaintiff's counsel was confident that Defendant's interrogatory responses and other discovery responses on this issue were not accurate or complete, and Plaintiff's counsel did not want to proceed with a scheduled Rule 30(b)(6) deposition without the necessary documents to prepare and question the witnesses. *See Exhibit OO-03, email dated February 5, 2018.*

13) Exhibit OO contains a chronological collection of discovery dispute correspondence between Plaintiff's and the City's counsel.

14) Defense counsel insisted that its answer was clear and the materials were accurate, reliable, and complete, and that the answers to the interrogatories were self-explanatory.

15) Because Plaintiff's counsel did not understand the documents nor could she determine who the snow inspectors were from reading same, she requested that Defendant actually answer the question under oath with a person with knowledge or provide a stipulation as to the meaning of the records.

*16)* The interrogatory answer concerning who the snow inspectors were was signed by the Mayor of the City and contained the caveat that he had no personal knowledge of the answers. *See Ex.BB; DD Answer # 4.*

17) Defense counsel repeatedly provided Plaintiff with attachments instead of written answers to the question, made representations as to the accuracy of the information presented, and orally explained numerous times how to interpret the attachments and why they answered the questions as to who the snow route inspectors were during which time frames.

18) I reminded defense counsel that she could not testify and that Plaintiff needed a document from a City agent that made the representations she was advising me of verbally.

19) Prior to the continuation of a suspended 30(b)(6) deposition of Defendant, Plaintiff ultimately asked for a defense stipulation containing the representations defense counsel had made concerning the meaning and source of the documents attached to its interrogatory answers.

20) Because the documents purporting to answer Interrogatory No. 4 were inconsistent from one discovery response to another and yet different again from Defendant's MCAD position statement, Plaintiff's counsel drafted an outline of a stipulation for Defendant and provided it to defense counsel  *See Ex. OO-05-06, email from Lisa Brodeur-McGan dated February 28, 2018.*

21) The stipulation draft provided to defense counsel was reviewed by the City and in fact provided handwritten edits to the draft document, but before it was completed or signed, the deposition of City was taken at the insistence of the City.  The City once again insisted Plaintiff could rely on the provided documents. *Ex.  OO-05, 07-10, emails from Kathy Sheehan dated February 28, 2018;*

22) The City never signed the stipulation, and in May 2018 for the first time defense counsel retracted its representations as to the reliability of the documents and then claimed that the information sought was unavailable. In June 2018, defense counsel reiterated in writing that it could not provide reliable documentation as to who worked as a snow inspector, when, where and how much they were paid for the job.  *See Ex. OO-10, 11.*

*23)* Further, in July 2018 Plaintiff's counsel was advised during a discovery dispute conference that the City could not answer the question as to who worked when and where for the job of snow route inspector, the job that Plaintiff sought and was eliminated from. *Ex. OO-13.*

24) During this same conference, the City admitted that the documents attached to its interrogatory answers were not reliable. The City then produced new documents never seen by Plaintiff's counsel concerning the identity of snow route inspectors during the relevant periods that it claimed it had recently found.  These records are attached to the summary judgment materials as Exhibit LL, and are different versions of documents provided by Defendant in discovery and different from the documents provided to the MCAD.  *See Ex. W, BB, DD.*

25) In the same July conference where the City stated it could not answer the questions of who worked, where, and when as a snow inspector and how much they were paid, defense counsel advised the City was moving for summary judgment.  Ex OO-*14*.

26) This conference with the City's counsel (Attorney Sheehan) occurred just days before Plaintiff's counsel's head injury, which caused her to be out of work for an extended period of time.

27) Due to her injuries and other family emergencies, Plaintiff's counsel could not move for sanctions or otherwise address the discovery abuse issues identified above.

28) Many of the documents produced by Defendant in the July 2018 conference were never seen by Plaintiff before and likely would have changed the course of the depositions of Defendant and its agents, which were already substantially completed.

29) Further, Plaintiff's counsel spent days attempting to reconcile the multiple versions of documents provided by Defendant and the documents attached to its interrogatories, which purported to state who worked as a snow route inspector.

30) The identity of who the primary inspectors and secondary inspectors were, and when they trained as such, was critical based on Defendant's position presented to the MCAD, but Defendant to date has failed to answer these questions in discovery. *Ex. BB, DD, HH, II, JJ*.

31) In addition to interrogatories seeking this information, Plaintiff's Rule 30(b)(6) deposition sought this information. *Ex. AA*.

32) Defendant presented John Rooney as its "person with the most knowledge" regarding this information. *Ex. K at* 7.

33) Vincent DeSantis, current head of the snow inspection program, was also deposed.

34) The City's deponents were unable to authenticate key documents attached as answers to interrogatories and were unable to testify from their memory about the identity of all persons who performed the Snow Route Inspector functions for the relevant years. Citations to this testimony are contained in the Statement of Facts, Nos. 2, 14, 167, and 168.

35) Further, City designee John Rooney questioned the accuracy of the interrogatory answers signed by Mayor Sarno, which purported to answer the question as to the identity of the snow route inspectors. *Ex. K at 140-141*.

36) Plaintiff has spent $2,058 in depositions costs and thousands of dollars in attorney fees in preparing for and deposing the City and its agents, and attempting to interpret the confusing and inconsistent documents and interrogatory answers produced by Defendant that it insisted was reliable and responsive.

37) To date, Defendant has never answered the critical questions as to the identities of all people who trained and worked as a snow route inspector from 2010-2017, and, according to defense counsel, "unfortunately, that information is not available." *Ex. OO-11*.

38) Prior to the City's admission that it could not state who worked as a snow route inspector and when, Plaintiff's counsel created a "cheat sheet," which is attached as Exhibit KK. This document listed all the persons who the City stated were on a list as a snow route

39)     inspector and all those who were paid under Code 4616. It separated these persons by DPW employees and non-DPW employees. *Exhibit KK.*

39)     Further, the chart designates by a check mark each year that a person received pay under Code 4616, which designates pay for snow route inspector according to the City. *Ex. KK.*

40)     If the person is listed on the chart but has no check mark, it means this person was listed on a City list of "snow route inspectors" but that they were not paid to perform the job according to the records. *Ex. KK.*

41)     A separate designation tracked who applied in 2012 and 2013 for the job. *Ex. KK.*

42)     A review of this cheat sheet quickly revealed that there was no consistency to the City documents and that the city's "lists" of snow route inspectors did not match its pay records. *See Ex. KK, LL.*

43)     Further, it revealed that there were many non–DPW employees remaining and added as a snow route inspector after the program was allegedly disbanded, and that there were no women paid to inspect or on the list of inspectors after 2014. *Ex. KK, LL.*

Signed under the pains and penalties of perjury, this the 9th day of January, 2019.

_____
Lisa Brodeur-McGan