# EXHIBIT J

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JEAN WILLIAMS, on behalf of herself and all similarly situated individuals,<br>　　　　　Plaintiff<br><br>v.<br><br>CITY OF SPRINGFIELD DEPARTMENT OF PUBLIC WORKS,<br>　　　　　Defendant | C.A. NO.: 3:16CV30179-MGM |

**AFFIDAVIT OF JEAN WILLIAMS**
**In Support of her Opposition to Defendant's Motion for Summary Judgment**

I, Jean Williams, make this Affidavit under the penalties of perjury and state that the statements made below are based on my own knowledge, or upon information and belief, or where indicated based on my review of the City of Springfield's documents it produced in discovery.

1)   I have been employed by the Defendant City of Springfield since 1991.

2)   I worked as a snow route inspector during the snow season 2012-2013; my last date working was February 2014.

3)   My title is Senior Clerk Typist for the Department of Public Works ("DPW") and my job description provided by Defendant to me is attached as Exhibit N.[1]

4)   I hold an associate's degree in General Business Administration from STCC and a bachelor's degree in General Management from UMASS Amherst, and received my MBA from AIC in 2008. I also earned a Leadership Certification from Westfield State College in 2009.

---

[1] All exhibits referenced herein are contained in the summary judgment exhibits package.

5) In addition to my job with the City, I am an adjunct professor at AIC, teaching business management courses, which include organizational behavior, management and human resource management.

6) I have worked at several different departments within the DPW. All jobs were with the designation "Senior Clerk Typist."

7) I first worked as a Receptionist in the Administration section, answering phones, picking up the mail, and Accounts Payable duties.

8) In the DPW's Business Office I worked in Accounts Payable.

9) For the Mayor's Clean City Program, part of my duties included registering recipients of "Aid for Families with Dependent Children" (AFDC) to do outside work and communicated with their social workers to provide attendance and other records. I also answered phones.

10) In Customer Service I took trash complaints concerning the Solid Waste department, handling them if I was able, and booked bulk pickup appointments.

11) I also worked the Solid Waste Division of the DPW.

12) After a significant city-wide layoff, I worked in the Business office again, scheduling bills for payment and handling the mail.

13) In the DPW's Engineering Department, my duties include logging Dig Safe permits, answering phones, picking up mail, sending out invoices to City vendors and contractors for payment, handling counter service for engineers, and taking sidewalk application requests and complaints.

14) Also I did other tasks listed in my job description, which is attached as Exhibit N to the Summary Judgment package.

15) Since I started with the City, I have attempted to advance in both title and in income.

16) I have not been able to progress my career despite my advanced degrees and my significant efforts.

17) I have applied for multiple positions which I believed I was qualified for and have never been selected.

18) I have verbally sought overtime opportunities from Mathew Sokop my supervisor.

19) I recently heard that others were given a chance to get overtime doing road line painting. I asked to do this work and was told I was not qualified. This position was not posted, and I don't know what the "qualifications" were.

20) In September and October 2012, the DPW posted the job of snow route inspector, which was a job paying $25 per hour plus overtime possibilities.

21) This job would have been in addition to my clerk typist job and would occur when it snowed.

22) I applied as required by the posting.

23) I understood from the posting that the City was looking for 40 snow route inspectors.

24) After the application process I attended a meeting in late 2012, which I understood to be for all persons who had applied for the posting.

25) There were no other women in the room and about 25 men.

26) I do not remember the details of this meeting, but it was about the job expectations and details.

27) At some point in 2012 I was advised that I was selected as a snow route inspector.

28) I don't recall anyone talking about different levels of inspectors or the terms primary or secondary/back up inspectors at this point.

29) I do recall that one of the first pieces of advice I received from City agents about the job was that if I was called by the robo-call system to perform as a snow inspector, I would need to be there within 30 minutes.

30) The first time I was called it was 11:00 pm and I worked until 1:00 pm the next day. I was excited to make this overtime pay and I will never forget the hours that I worked that day.

31) The first day I worked, I understood that I was training; I worked with Mr. George Laroe, an experienced DPW employee foreman and snow route inspector.

32) We had a good relationship.

33) I remember training with Mr. Laroe at least twice. My training consisted of riding with him, watching him, learning what he did, and who he interacted with and when for the snow route inspection job.

34) Mr. Laroe gave me details of what I was "inspecting" and verbally told me what the standards were. Neither he nor anyone else gave me any written materials about the specifications or the City's snow removal standards.

35) I learned during my training and from general experience working for the DPW that that the snow route inspectors have an entire snow program that they work within.

36) There is a "Control Room" or "snow room" that snow inspectors are trained to call in to using their two-way radios to report if a road was not cleared correctly.

37) I was taught that inspectors who found issues regarding noncompliance of snow plowers were to call in to the DPW Control Room and report the issue, at which point those in the Control Room would handle remedial efforts and direction to the snow plowing employees or third party contractors.

4

38) I was also trained that if a snow inspector encountered any civilian problems or "beefs" during their work, we could call the police.

39) While driving and training with Mr. Laroe, I never heard him issue remedial efforts directly to snow plowing contractors or perform remediation himself.

40) I did not have a CDL license and one was not required for the job.

41) Mr. Laroe he never told me while I was training that I would deal with specific citizen complaints, and I learned from a few sources that complaints and towing were generally handled by the Control Room and one specific employee.

42) If I was required to deal with citizen complaints as part of the snow route inspector job I could have handled it because I have dealt with thousands of complaints over time while working with the DPW.

43) I was also trained that there were zone inspectors, intersection inspectors, and other supervisors in the snow program who oversaw the operations in addition to those in the Control Room, and this fact is also reflected in the documents produced by the City in my case.

44) Similarly, there was an entire tow/citation division within this program. If we saw a car that needed to be towed I understood we were to call the Control Room and the issue was handled by the towing and ticketing person together with the police department. This was not a function of my job of snow route inspection as I was told and trained.

45) Regarding the City's Statement of Facts No. 7, the City references a snow "program". However this description is not in my opinion the job of snow inspector. The DPW has others who work different tasks involving snow. The tasks listed in No. 7 were not the tasks I was trained to do.

46) The snow route inspector job did not require the inspector to physically clean up any problems, to operate snow removal or plow equipment, or to physically remediate a snow problem.

47) The job entailed checking to make sure others did what they were paid to, and if they did not, then I would call the Control Room and report it. It also required record keeping as a large part of the job, which I had substantial experience with.

48) I rode with George Laroe three times over the course of two snow seasons.

49) During my training, I was not told it was the snow inspector's job to respond to emergencies. I was never trained that I was to rush to a snow plow scene or a roadside emergency; it is not an emergency response position.

50) I will admit that I could have used some more training and a review of the materials that the City produced in discovery showed that others received more training than I did.

51) For instance, a review of payroll documents of those people performing snow route inspecting were given more assignments when they were first hired to do snow route inspection, which means that they got more training time than me.

52) I only trained with George Laroe, and once worked with Sheila Delgado in the same vehicle. Ms. Delgado was also a new snow route inspector.

53) I do not feel that I was adequately trained after three times, and I was never given anything in writing (no manuals, specs, or protocols) about what the rules were for how many inches from the curb the plow was, etc.

54) I learned recently from two snow route inspectors that they received written materials years ago which they referred to as a manual.

6

55) While I was training, I was told by Mr. DeSantis that I was doing a good job. This occurred my first year, and it was the first day that I had gone out on my own.

56) I never received any discipline or complaints while I was doing this job. There were also no notes in my personnel file regarding my performance as a Snow Route Inspector.

57) Further, in February 2018 I saw George Laroe in church. I asked him how I had done as a snow route inspector and he told me I did a wonderful job.

58) I was not called for every storm during snow season 2012-2013.

59) The next season the job was posted again and I applied again. This time in the posting the City listed primary and secondary inspectors.

60) I never knew there was any difference between a primary and secondary inspector before this point.

61) I was not told in my first season that I was a secondary or backup.

62) I know that in snow season 2012-2013 Luca Mineo worked snow inspection far more than I did. The pay records produced by the City in discovery support this as well. (*Exhibit LL at DD007-DD0016*)

63) Mr. Mineo was allegedly a "secondary" or "back up" in the 2012-2013 snow season and pay records have him working five times more than me.

64) I do know that I required training before going out on my own the first year, but no one told me how long the training was scheduled to last.

65) When I inspected after my training with Laroe, Mr. DeSantis told me that I had done a great job.

66) I assumed that my initial training was done or adequate to permit me to inspect on my own thereafter.

67) During the 2012-2013 snow season I was called to inspect and train two times.

68) During the 2013-2014 season I worked two days as a snow inspector.

69) Patrick Garrity is titled a Civil Engineer with the City. The City's public website reports that he was earning $70,000 annually in salary. Upon information and belief, he is not a licensed engineer. In 2012 he began working for the City as a snow route inspector and worked many more storms than I did.

70) I have reviewed the payroll records that the City produced in my case (they are attached to this summary judgment package as Exhibit LL DD007-DD0016).

71) I understand from these City records and deposition testimony that snow inspector work is coded under number 4616 and my regular job is coded under number 0519.

72) I looked at all the payroll time under code 4616 and I do not believe these records are accurate for the amount of time I worked from 2012 to 2014 either training for or acting as snow route inspector.

73) I remember vividly that the first time I was called I worked 11:00 pm to 1:00 pm the next day, 14 hours, and this time is not on these documents.

74) I was recently told by two current snow route inspectors (Greg Norflet and Joe Korman) that there is a book governing snow route inspectors. I do not know what it contains because I have never seen it.

75) At one point I went into the Control Room with Mr. Laroe and became familiar with who and what was in that room for the snow program.

76) Luca Mineo hit the car of Chris Barnes, another DPW worker, a few years ago while working; I have never hit any parked cars while driving in the snow.

77) I read some of Mr. DeSantis' testimony stating what he believed the job of snow inspector entailed. I am not sure what he meant that the job required handling complaints, because when I was training I never saw Mr. Laroe deal with any complaints and he never told me that I would have to deal with complaints. His only training to do with complaints was to say that if I had an issue while doing the job or if I encountered any "beefs" while inspecting I should contact the police.

78) I never saw any complaints ever or any "beefs" during my first day working alone. If I had I could have handled it, but I understand it was not required.

79) Greg Norflet is an engineering aide for the DPW. He has a high school diploma. He is also a snow route inspector. He told me that he does not like doing it but is required to.

80) I know of at least five current snow route inspectors who are not DPW foreman.

81) I was told by Greg Norflet that his specific snow task is to deal with cars that need to be towed or with people presenting a conflict during storms. He told me that he uses the police to handle this situation.

82) Based on personal experience and what I have been told, I believe that I would not have had to deal with personal conflict or "complaints" as a snow route inspector.

83) After February 2013, which was near the end of the second snow season I worked, I was no longer receiving calls from the robo-call system.

84) On November 7, 2013, DeSantis issued a memo about the status of the snow route list. Exhibit R.

85) In November 2013, I approached my boss Mario Mazza and then Mr. DeSantis and asked why I was not called to inspect. DeSantis responded that currently the City had enough inspectors to meet their need and I was not needed or the list.

86) I asked Mr. DeSantis to see the list. He showed me a list but did not give me a copy. I was not on the list he showed me, nor were there any other women on the list. I commented to him that there were no women on the list and he shrugged his shoulders.

87) Because I believed this was discriminatory, I wrote to Al Chwalek on December 16, 2013 complaining that there were no women on the list of snow inspectors, that I had not been called, and that others less qualified had been called. *(Exhibit S)*

88) I was not given a satisfactory or believable response from Mr. Chwalek either.

89) I complained to the City's diversity person and Mario Mazza. They both told me when I complained about no women on the list that it was not discrimination. At that point they told me that I was on a "back up" list.

90) After filing this lawsuit, I read Defendant's records and I am not listed as a back up inspector on many of the "lists" provided by defendant. *(Ex. LL)*

91) When I was shown this list I was not on it.

92) I believe my last date working as a snow inspector was in February 2014 and my review of the City's records is consistent with this memory.

93) I read the deposition transcript of Mr. DeSantis. He testified that after I asked him about the list he told me I needed more training to be on the list; however, he did not tell me this at this time or thereafter.

94) Further, he made no efforts to train me after February 2014 and I was not given any other training opportunities.

95) From Mr. DeSantis' deposition testimony I learned that the City's lists of inspectors contained people who were substantially junior to me at the DPW (Luca Mineo, Tyrone

Holt, and Patrick Garrity), and some with no DPW experience (Luis Martinez/Code Enforcement).

96) Once a month I go to DPW meetings concerning overall DPW matters, street conversions, and major projects and over time have learned about the streets, locations, and nuances of the City of Springfield.

97) I believe I know more about DPW operations than those who work outside of the DPW, for instance housing inspectors.

98) In addition, have lived in Springfield for 45 years and am very familiar with this city.

99) I have driven in snow since I was 25 years old and I am currently 57 years old. I believe I am a great driver in the snow.

100) Patrick Garrity's job is comparable to mine and he deals with permits, as my job description requires. He is on the list for snow route inspectors. He has only been employed by the DPW since about 2012 and his job does not make him more qualified than I am to be an inspector.

101) Patrick Garrity, wh, like me is not a DPW foreman, applied for the snow inspector job in 2012, and stated he had worked the for two years; which shows that he had an opportunity to do snow inspection before the posting in 2012, and a similar opportunity was not given to me.

102) Regarding complaints I receive while doing my job as Senior Clerk Typist, residents come in and complain about many things in the scope of my job. For example, residents complain about their sidewalk conditions (that their insurance will be cancelled if their sidewalks are not done) or that their streets are not paved.

103) For instance, there is a veteran who has filed legitimate complaints about his sidewalk for more than 12 years, and he is still waiting on "the repair list." I am instructed to tell him and others who file repeated complaints that they should "go to the public meetings." He is only one of thousands of complaints about sidewalks alone. I have a file cabinet about three feet long filled with applications for sidewalk repairs.

104) I am experienced and capable of dealing with irate, angry, and frustrated residents.

105) After I received no satisfaction about the snow route inspector job from complaining to Mr. DeSantis and my union, I filed a complaint with the MCAD.

106) The City told the MCAD that I was listed as a backup inspector. Thereafter, I was never called again and pay records show that the City never paid me again as a snow route inspector.

107) The City also told the MCAD that there were five women listed as snow route inspectors.

108) I did not believe either statement so I filed this case (in the Hampden County Superior court, which was then moved to this court).

109) I have reviewed the paperwork the City produced to my lawyer in my case, as well as depositions taken.

110) I understand that the City is now stating that I was removed from the list entirely.

111) My review of the City's lists, provided in discovery includes non-DPW workers, such as Mr. Holt who were less experienced than I. *(Ex. LL)*

112) I believe they were less experienced based on my familiarity with the people on the lists of primaries as well as a review of their publicly available information.

113) I also now see that the union rep to who I complained, Luis Martinez, is named by the City as a primary snow route inspector. When I complained to him about this situation he

told me that my complaint and grievance was not worthwhile to pursue. He did not tell me he was hired to do this work and I learned it when I read the City's discovery materials.

114) He is not a DPW employee; he works for the Code Enforcement Division, and I believe I am more qualified than he to be a snow route inspector.

115) No one ever told me directly that I needed more training, had not done a good job, was not qualified, or that the qualifications changed in 2015 for this job.

116) No women went to the meetings, nor did I see any other women other than Delgado perform as an inspector, and there were no business records or pay records produced by the City in this case for any women performing the snow route function other than me. *(Ex. LL)*

117) These documents were requested but never provided. (*See Exhibit I*)

118) Pay records for snow removal do not list Delgado. (*See Ex. LL at DD007-DD0016*)

119) At no time did Mr. DeSantis interview me or question me about my abilities and experience, nor did I work with him when he first worked for the DPW.

120) I did not get the same training time or call times for snow route inspection as male primaries or male backups

121) I was not called as a backup when Mr. Laroe was out. I was not trained and/or utilized the same as male back up inspectors during the relevant time frame.

122) I believe that Luca Mineo, a newer DPW employee hired around 2012, was less qualified than me and he was called to be an inspector for storms that I was not called for.

123) I base this on personal experience and my review of the documents produced in discovery by defendant attached as Exhibit U, X, Y, LL.

13

124) On November 12, 2014 Vincent DeSantis emailed me about the status of inspectors. (*Exhibit T*)

125) According to the documents produced by the City in my case, no women were ever listed as primary and no women were listed as backups on the robo-call snow list for years 2012-2017. *(Ex. LL)*

126) The City's pay records show that I was not earning the same money as other snow inspectors; I was making less than males.

127) Men were paid as much as 45 dollars an hour to do the same job I was doing for 25 an hour. *(Ex. KK; LL at DD007-DD0016)*

128) After snow season 2013-2014, the City did not post the job of snow route inspectors again but I can see from the documents provided in discovery in my case it hired and added primary and back up inspectors to their list of snow inspectors. See *Ex. LL.*

129) I was paid less than some of the men for doing the same job and I was not given the same training opportunities or comparable opportunity to work (hours or days). (*See Ex. KK; LL at DD007-DD0016*)

130) I, like some others, was paid $25 to train in December 2012 and 2013 and men were paid more based on the documents Defendants produced. See *Ex. LL, KK.*

131) When Mr. Laroe was out, no one else trained me.

132) I worked in the snow route Section 11 with Mr. Laroe only.

133) After February 2014 I never worked or trained again as a snow inspector.

134) I was qualified to be a snow inspector and was given the job, but was not trained or utilized like the men and ultimately did not get to keep the job while others less qualified did.

135) I believe different standards were applied in my selection process than for the men, and the men were paid for training while I was not.

136) All the people hired and retained by DeSantis for Snow inspection were men.

137) I reviewed the business records of the City in my case, and they show that three of the five women identified by the city at the MCAD as snow route inspectors were never paid for snow route inspection. The City's records also show that none of these five women are snow inspectors currently, nor have they been listed as inspectors since February 2014.

138) Further these three women never worked as an inspector based on my conversation with them.

139) I claim gender discrimination against the City because of its agents' conduct in connection with the snow route inspector.

140) I believe I was held to higher standards than the men and a different hiring criteria was used for me than for the men.

141) Under the "new" criteria cited by DeSantis in his deposition, I remain qualified to do snow route inspection but have not been given the job since February 2014 while other similarly situated men have.

142) I do not believe that I was ever considered to be Mr. Laroe's alternate because there were storms he did not work but I was not called to replace him but others (men) were.

143) When I asked Mr. DeSantis why I was not working as a snow route inspector, he did not tell me there were issues regarding my performance in the job.

144) George Rooney, Vincent DeSantis, and Greg Norflet were not snow inspectors, but performed other snow functions, such as the snow storm Control Room function.

Signed under the pains and penalties of perjury, this the 28 day of December, 2018.

_____
Jean Williams

COMMONWEALTH OF MASSACHUSETTS
COUNTY OF HAMPDEN

On this 28th day of December, 2018, before me, the undersigned notary public, personally appeared Jean Williams, proved to me through satisfactory evidence of identification, which was [a Massachusetts driver's license bearing the photographic image of the person's face and signature] [based on my personal knowledge of the identity of the person], to be the person whose signed the preceding or attached document in my presence, and who swore or affirmed to me that the contents of the document are truthful and accurate to the her knowledge and belief.

_____
Sharon M. LeFeave, Notary Public
My commission expires: 4/22/2022

16