# EXHIBIT M

Pages 1-203

Exhibits 1-7

------------------------------------------------------

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A. NO.: 3:16CV30179-MGM

JEAN WILLIAMS, on behalf

of herself and all similarly

situated individuals,

Plaintiff,

v.

CITY OF SPRINGFIELD

DEPARTMENT OF PUBLIC WORKS,

Defendant.

------------------------------------------------------

DEPOSITION OF VINCENT DeSANTIS, III

TAKEN AUGUST 16, 2017

AT THE LAW OFFICES OF

BRODEUR-McGAN, P.C.

1380 MAIN STREET

SPRINGFIELD, MASSACHUSETTS

Reporter:   Raymond F. Catuogno, Jr.

1      Q.      And you worked at the DPW before?

2      A.      Correct.

3      Q.      So what I'm trying to get a sense

4  of, by way of percentage, is how many people,

5  when you came into the DPW in October of 2013,

6  what percentage of those people had been there

7  when you had left the DPW the first time?

8      A.      Okay.  I would say like sixty

9  percent of the people I knew.

10     Q.      Were you familiar with Jean

11  Williams when you came back to the DPW?

12     A.      I knew of her.  I had never dealt

13  with her before the first time, when I was here

14  the first time.

15     Q.      So you never had any dealings with

16  Jean Williams when you were first at the DPW?

17     A.      Never.

18     Q.      Never talked to her on the phone?

19     A.      No.  I was just going to say, I was

20  out in the field working, I hardly ever came

21  into the yard.  We had our jobs and we went

22  right out to the job, so --

23     Q.      Okay.  I don't have in my head the

24  physical plant makeup of where the DPW hangs

```
 1   employees.
 2        Q.     Okay.  And as it relates to the
 3   snow inspectors, do you know what the City was
 4   doing in the 1990 era for snow inspectors?
 5        A.     Yes, I do.
 6        Q.     What were they doing?
 7        A.     We had 12 -- we had 12 routes and
 8   we had 12 foremen available for inspecting.  We
 9   also had 12 working foremen and foremen
10   available for back-up inspectors.
11        Q.     Okay.  So in the '90s, when you
12   were still with the City?
13        A.     Yes.
14        Q.     You hadn't left yet?
15        A.     No.
16        Q.     You personally were familiar with
17   the fact that the City of Springfield had 12
18   snow routes, snow inspection routes?
19        A.     Yes.
20        Q.     And they had 12 foremen available
21   as primary inspectors to inspect the 12 snow
22   routes?
23        A.     Correct.
24        Q.     And they also had 12 back-up snow
```

1    inspectors?

2        A.    Correct.

3        Q.    Okay.  And were you on either one

4    of those lists?

5        A.    Yes, I was, I was a primary

6    inspector.

7        Q.    And were you familiar, back in the

8    '90s, as to whether or not there was an actual

9    list somewhere that was published or posted or

10   handed out?

11       A.    No, I'm not.  I just responded to

12   the call.

13       Q.    Okay.  Do you know if you ever had

14   to apply to be on that list as a primary snow

15   inspector?

16       A.    No, we did not.  We worked our way

17   up to foreman to become snow inspectors.

18              MS. deSOUSA:  I'm going to

19        caution you, this always happens, but

20        you're starting to talk on top of Attorney

21        Brodeur-McGan.

22              THE WITNESS:  Oh, I'm sorry.

23              MS. BRODEUR-McGAN:  Off the

24        record.

1          A.          I worked with a few different

2     foremen on different routes for three or four

3     snow seasons.

4          Q.          We were talking about historically

5     what the City had, and you said they only had 12

6     primary inspectors and 12 routes?

7          A.          Correct.

8          Q.          So just so I can get my brain where

9     you are, when you came in in October of 2013,

10    before you changed anything, how many snow

11    inspection routes were there?

12         A.          20.

13         Q.          Do you know who had changed or

14    increased that?

15         A.          No, I don't.

16         Q.          How many currently are there, snow

17    inspector routes?

18         A.          It's a difficult question because I

19    just changed it.  Do you want what happened last

20    winter or what's going to happen this winter?

21         Q.          Why don't you tell me both.  So

22    when you came in the City in 2013, October,

23    there were 20 snow inspection routes?

24         A.          Correct.

 1      Q.      And then, was that changed after

 2  you came in?

 3      A.      Not at that time.

 4      Q.      At some point, was it changed?

 5      A.      Not yet.

 6      Q.      When was the first time it was

 7  changed?

 8      A.      This winter.

 9      Q.      When you say this winter, you're

10  talking about --

11      A.      This coming winter, I'm going to

12  change it.

13      Q.      Oh, it's going to be changed?

14      A.      Correct.

15      Q.      I see.  So it hasn't been changed

16  yet?

17      A.      No.

18      Q.      Or it's been changed, but not

19  implemented?

20      A.      It's not implemented.  I worked on

21  the routes all summer.

22      Q.      And what did you do?

23      A.      I knocked it down to 15 routes.

24      Q.      Why did you do that?

1      A.      Because I had -- there are a few

2  inspectors out there that are not ready for

3  being primary inspectors, so I'm going to have

4  them have some more training.

5      Q.      Who are those people?

6      A.      Do you mean by names?

7      Q.      Yes.

8      A.      Okay.  Tyrone Holt, Luca Mineo,

9  Edward Cunningham, and -- I hate to give you

10 names because I haven't told these guys yet.

11              MS. BRODEUR-McGAN:  We can

12      reach a confidentiality agreement, we can

13      talk about it, like for a certain period

14      of time.

15      A.      I was going to do it right after

16 Labor Day.

17              MS. deSOUSA:  Yes.  If we

18      could not have those names released to

19      your client, until they've heard it from

20      Mr. DeSantis.

21              MS. BRODEUR-McGan:  Off the

22      record.

23      (Off-record conference)

24              MS. BRODEUR-McGAN:  Back on

1          the record.  Going on the record, Mr.

2          DeSantis, I'm going to have you give me

3          the list of people, and then when we are

4          off the record, Attorney deSousa and

5          myself have agreed to reach a

6          confidentiality agreement as to those

7          names to protect the thing that you're

8          concerned about.

9                    THE WITNESS:  Okay.

10          Q.     (By Ms. Brodeur-McGan)  So the

11  names of the people, you said Holt, Mineo,

12  Cunningham, and who else?

13          A.     Will Ward and Edel Alvarado.

14          Q.     Edel is a man?

15          A.     Yes, he is.

16          Q.     Okay.  And that's the first name on

17  Exhibit 3?

18          A.     Yes.

19          Q.     And these are the five names that

20  are going to be removed from the primary

21  inspectors' list?

22          A.     I'm going to do it a little more

23  delicately than that.  I'm going to tell them

24  that they need a little more experience and

 1  they're going to have to get some more training.

 2       Q.      And I understand you have not told

 3  these people yet?

 4       A.      No, I have not.

 5       Q.      And so, what type of additional

 6  training do you believe they need?

 7       A.      This will have to go with a more

 8  experienced inspector and see how they handle

 9  themselves.

10       Q.      Were there specific issues with

11  these five people and their job performance?

12       A.      I seem to get a lot of complaints

13  from their areas, a lot more than I should have.

14       Q.      And just as an example, it's fair

15  to say Edel Alvarado has been on the list since

16  at least 2012?

17       A.      He has been there quite some time.

18       Q.      And was Edel alvarado ever trained

19  on the routes?

20       A.      I don't know.

21       Q.      And Will Ward also has been on the

22  list since 2012.  Do you know if Will Ward has

23  ever been trained on the snow inspection job?

24       A.      I don't know.

1    Q.    And Ed Cunningham, he's been on all

2  the lists that I've seen, do you know whether or

3  not he has been trained previously?

4    A.    I'm not sure.  These names were all

5  here -- the names I'm giving you were all there

6  when I arrived in Springfield, so I don't know

7  the extent of their training.  I wasn't happy

8  with it, but that's me.

9    Q.    Okay.  And so, I'm going to refer

10 you back to page 2 of 7 of Exhibit 4, and I'm

11 going to refer you -- still in the second

12 paragraph which you've already read, and I'm

13 going to point where I'm going to read so you

14 can see it, and then I'm going to read it out

15 loud.  So this is page 2 of 7, the second

16 paragraph.  "DPW changed the process by creating

17 smaller routes rather than having only 15 around

18 the city.  It created smaller ones, resulting in

19 the current 20 routes for snow removal."  Do you

20 see that, what I just read?

21    A.    Yes, I do.

22    Q.    So what time frame did the DPW

23 change the process from 15 to 20?

24    A.    I believe -- I'm just recalling the

```
 1          Q.      Okay.  So I noticed that there were

 2    two people that are on the primary snow

 3    inspector list that do not have applications

 4    contained in 248 through 286?

 5          A.      Do you know which page?  I'm not

 6    sure --

 7          Q.      I think it's the first name,

 8    Edel --

 9          A.      Alvarado?

10          Q.      Yes.  So do you know how he got on

11    the primary inspectors' list if he never

12    applied?

13          A.      No, I don't.

14          Q.      And he's actually one of the people

15    who you have an issue with being a primary

16    inspector?

17          A.      Yes, I do.

18          Q.      Did you put him on that list to

19    become a primary inspector in 2013?

20          A.      No, I did not.

21          Q.      Did you put him on the 2014 list?

22          A.      Yes, I did.

23          Q.      And why did you do that?

24          A.      I hadn't made a full inquiry into
```

1   everything, I was still sorting everything out.

2        Q.    Do you know a Luis Astacio,

3   A-S-T-A-C-I-O?

4        A.    No, I don't know him, I know of

5   him.

6        Q.    Do you know if that's how you spell

7   his last name?

8        A.    Yes, it is.

9        Q.    And the name that did not apply,

10  that is, primary inspector, Jacob Sedin?

11       A.    Jacob Seldin, S-E-L-D-I-N.

12       Q.    Do you know how it is that he

13  became a primary inspector and didn't apply for

14  it?

15       A.    He was there when I arrived.

16       Q.    So of the names that are listed --

17  let's look at the primary inspector list.  So

18  you produced for me, and -- I'm going to show

19  you Exhibit 2.

20       A.    Okay.

21       Q.    And I'm referring to the Primary

22  Inspectors List.

23       A.    Mm-hmm.

24       Q.    Now, this list of 2013, I'm only

1     Q.     Okay.  So of the 26 names, six of

2  them are not snow inspectors.  So we have 20

3  names as snow inspectors that were primary

4  inspectors in 2013?

5     A.     Correct.

6     Q.     So can you explain, if there were

7  20 listed snow inspectors when you came in in

8  2013, why did you need to post for new ones?

9     A.     I don't know why.  That's a program

10 I stopped.

11    Q.     Okay.  Tell me about when you

12 stopped the program.

13    A.     At the end of the 13/14 season I

14 stopped it.

15    Q.     At the end of the 13/14 snow

16 season?

17    A.     Yes.

18    Q.     You stopped what?

19    A.     The write-in for snow inspectors.

20    Q.     Is that because you didn't need new

21 snow inspectors?

22    A.     Not necessarily, no, it was because

23 I was getting applications from outside the

24 department of people who had no base knowledge

 1 | of snow removal at all, that never drove the
 2 | city streets.  They're in offices, they're doing
 3 | their other jobs, and they just thought they
 4 | could come out and inspect snow, and I couldn't
 5 | train them all.  There are only 5, 6 plowable
 6 | snowstorms in a season, you can't possibly train
 7 | 25 applicants.
 8 |        Q.     And -- so you're not saying that
 9 | there wasn't a need to retain additional snow
10 | inspectors?
11 |        A.     No.  There's always a need for
12 | back-up inspectors.  My primary inspectors, they
13 | come in every storm.
14 |        Q.     Did you add to the list of primary
15 | inspectors since 2014?
16 |        A.     There have been retirees, yes.
17 |        Q.     So you're just saying to me that
18 | you just stopped posting, that you were going to
19 | hire primary snow inspectors?
20 |        A.     Right.
21 |        Q.     And that you changed the method
22 | with how you were going to select the primary
23 | inspectors?
24 |        A.     Yes.

1      Q.      And that you no longer were going

2  to post that people could apply for that job?

3      A.      Correct.

4      Q.      And part of the reason why you

5  changed it is because people were applying that

6  you believed were not qualified?

7      A.      Correct.

8      Q.      And one of the things that you

9  mentioned is, you said people applied that never

10  drove the city streets?

11      A.      Correct.

12      Q.      And what do you mean by that, never

13  drove the city streets?

14      A.      The people in the primary

15  inspectors, they're out on the city streets

16  every single day.  They know the city in and

17  out, it's just -- it's different than just

18  driving, you know, going from place to place in

19  Springfield.  You're actually working, you have

20  to know where you're going, you have a job to

21  do, you have to know where it is, you have an

22  emergency, you have to know the quickest way to

23  get there.

24      Q.      So are you telling me that you

1   personally will not hire anybody as a primary

2   snow inspector who hasn't driven the streets in

3   the capacity of a job working in the snow for

4   the City of Springfield?

5        A.      I don't consider them, no.

6        Q.      Okay.  So I'd like to look at the

7   job description, and if we could, I'm going to

8   move this over here.

9        A.      Go back to this.

10        Q.      Put that away and we'll go back to

11   this.  If you could turn to Bates Stamp 139, the

12   job description 2012?

13                MS. deSOUSA:  I'll need to

14        look over your shoulder on this one.

15                MS. BRODEUR-McGAN:  It's

16        Exhibit 3.

17                MS. BRODEUR-McGAN:  Off the

18        record.

19        (Off-record conference)

20                MS. BRODEUR-McGAN:  Back on

21        the record.

22        Q.      (By Ms. Brodeur-McGan)  The job

23   description, sir, appears on -- is this a copy

24   of the job description that was posted in

```
1   posting of 141?

2        A.      I believe so.

3        Q.      Okay.  And I have not seen a job

4   description for snow route inspector from the

5   2013 time frame.  Do you know if there was one

6   in existence?

7        A.      I do not know.

8        Q.      If you could look at 139, can you

9   tell me, did you ever change the content of the

10  job description that is contained on 139 for

11  purposes of the job description for snow route

12  inspectors?

13       A.      I did not.

14       Q.      Do you have any information, and

15  I'm going to refer you to the bottom portion of

16  139, it says, knowledge, skills and abilities,

17  and it lists various things underneath that

18  section of 139.  Do you know who drafted that

19  portion of the job description?

20       A.      No, I don't.

21       Q.      Do you know who drafted any portion

22  of the 139 job description?

23       A.      No, I don't.

24       Q.      Did you ever add to the job
```

1    description for snow route inspectors?

2          A.        No, I did not.

3          Q.        Do you know of anybody who changed

4    it since 2012?

5          A.        No, I don't.

6          Q.        Have you personally ever been

7    involved with changing job descriptions for

8    anybody within the DPW?

9          A.        In this DPW?

10         Q.        Yes.

11         A.        No.

12         Q.        Just so I'm clear, since you were

13   deputy director, you personally have never

14   changed a job description of any DPW employee?

15         A.        No, I did not.

16         Q.        And you've never been involved with

17   changing any job descriptions of any employee

18   while you have been a deputy director?

19         A.        No, I have not.

20         Q.        And sitting here today, you have no

21   information about how the job descriptions were

22   originally created?

23         A.        No, I don't.  This didn't exist

24   when I was here.  This was made up during this

1  time.

2       Q.      Okay.   When you say this, you're

3  referring to 139?

4       A.      Yes.

5       Q.      So when you were first working for

6  the DPW for Springfield, as far as you knew,

7  this snow route inspector job description that

8  I'm looking at on 139 did not exist?

9       A.      No, it did not.

10      Q.      And to your knowledge, were there

11  any job descriptions for snow route inspectors

12  in existence when you were first working for the

13  DPW?

14      A.      No, there were not.   It was part of

15  being a foreman.

16      Q.      Okay.   So this is a separate

17  question, and I'm referring to the time when you

18  first worked for the City of Springfield in the

19  DPW, okay, when you were either a foreman or a

20  laborer.   When you -- did you ever inspect

21  snowplow jobs in your capacity as either foreman

22  in the earlier days or as a laborer?

23      A.      As a foreman.

24      Q.      And when you inspected as a foreman

1   currently for snow route inspectors?

2        A.       Straight time is 30 dollars an hour

3   and overtime would be 45.

4        Q.       Okay.  And from -- and let's -- I

5   want to talk about snow inspector time frame.

6   So you talk about winter, so you say 2013 winter

7   to 2014 winter?

8        A.       Yes.

9        Q.       2014 winter to 2015 winter?

10        A.       Yes.

11        Q.       And 15 to 16?

12        A.       Yes.

13        Q.       Okay.  So for 13 to 14 and 14 to

14   15, and 15 to 16, what was the rate of pay for

15   snow route inspectors?

16        A.       It hasn't changed since 2013, it's

17   been the same.

18        Q.       So the 30 and the 45?

19        A.       Yes.

20        Q.       And how about for 2012 to 2013,

21   what was the rate of pay?

22        A.       I would have to look at the

23   posting, the letters, because it was -- I think

24   it was less.

1         Q.      Okay.  So if you look at 140, that

2    rate of pay published on that would be 13 to 14

3    snow year?

4         A.      Yes.

5         Q.      Okay.  And so you're saying, in

6    order for you to tell me what the rate of pay

7    was from 12 to 13, you would have to look at

8    what?

9         A.      141.

10        Q.      Okay.  And what was the rate of

11   pay?

12        A.      It says 25 dollars an hour.

13        Q.      So do you believe that that pay of

14   25 dollars an hour was used for snow inspectors

15   that worked from 2012 to the 2013 winter?

16        A.      I believe so.  If it was there,

17   they'd have to pay that rate.

18        Q.      Could they pay more?

19        A.      No, they would pay what it says.

20        Q.      What it says on 141?

21        A.      Yes.

22        Q.      And what document -- and you can

23   use the name of the document or what you call

24   the document, what other documents would you be

1  able to look at to confirm that the employees

2  that were working as snow route inspectors from

3  the 2012 to the 2013 winter were getting paid 25

4  dollars an hour?

5       A.     I think you'd have to go through

6  the payroll of that time frame.

7       Q.     The payroll of that time frame?

8       A.     Yes.  If an employee -- because of

9  union regulations, if an employee was already --

10  if an employee was already making over 25

11  dollars, like say one of the engineers, you

12  can't cut his pay to 25 to make him at the

13  snow -- he would get his regular rate.

14       Q.     And what regulation do you believe

15  says that?

16       A.     They have the union contracts.

17       Q.     Could it be part of the selection

18  process that you were not going to hire people

19  that were making 40 dollars an hour to do a 25

20  dollar an hour job?

21       A.     I don't know their thinking at that

22  time.

23       Q.     Did you involve that in your

24  thinking when choosing who the primary

```
 1  inspectors would be?

 2       A.       No.

 3       Q.       So is it also currently true that

 4  if there were primary inspectors on the list, if

 5  they were making more for their other job, then

 6  they would be getting paid more than 30 dollars

 7  or 45 dollars an hour for overtime for the job

 8  of snow inspector?

 9       A.       Can I clarify?

10       Q.       Yes.

11       A.       The 45 dollars is the overtime

12  rate.  No matter what their pay scale, that 45

13  stands on overtime.  I don't know what they make

14  per se, but let's say an engineer was making 32

15  dollars an hour, and the storm happened on

16  straight time, I could not pay him 30, I would

17  have to pay him his rate of pay.

18       Q.       SO where do you think it says that?

19       A.       In the union contract.

20       Q.       And you're telling me that when you

21  personally were involved with selecting who the

22  primary inspectors would be, you did not

23  consider whether or not their pay rate was

24  higher than the published rate?
```

1      A.      No.

2      Q.      And you're telling me that you

3   believe the union contract requires you to pay

4   more if their single time rate was higher?

5      A.      Their rate is stated in the

6   contract, yes.

7      Q.      Okay.  Do you know if the -- so let

8   me understand one other thing.  As far as you

9   understand, there was no posting for snow route

10  inspectors until the first time in 2012?

11     A.      To the best of my knowledge, yes.

12     Q.      And then in 2012, this was a

13  discrete job, snow route inspector?

14     A.      That's what it appears to be, yes.

15     Q.      As well as 2013, it was a discrete

16  job, snow route inspector?

17     A.      Yes.

18     Q.      And in 2014, the 14 to 15, was

19  there any longer a discrete job of snow route

20  inspector?

21     A.      I did not post it, no.

22     Q.      So is there still currently,

23  however, a discrete job of snow route inspector

24  from 2014 to 2015 year?

```
 1          A.      No, I did not.

 2          Q.      And is it fair to say that you did

 3   not talk to anybody in, say, HR, about adding

 4   that as a required ability for the purpose of

 5   the job description for snow route inspectors?

 6          A.      No, I did not.

 7          Q.      I'm going to step back a little

 8   bit.  In your journey as a supervisor and

 9   working for either the West Springfield DPW or

10   Springfield DPW, or any other employer, were you

11   ever familiar with the term of industrial

12   organizational psychologist?

13          A.      No.

14          Q.      Do you know anything about

15   something called job studies done by -- and

16   we're going to call those IOs, industrial

17   organizational psychologist?

18          A.      No.

19          Q.      Did you know anything about

20   validation studies for purposes of determining

21   job descriptions and essential functions of

22   jobs?

23          A.      No.

24          Q.      Have you ever heard anything about
```

1   that?

2       A.      No.

3       Q.      Okay.  So it would be fair to say

4   that your desire to add to a job description of

5   the ability to know the roads in a snowstorm and

6   have driven them, is not something you've

7   discussed with an expert?

8       A.      No.

9       Q.      And not something you've discussed

10  with an IO?

11      A.      No.  It comes from my 32 years of

12  doing this job.

13      Q.      Okay.  Now, let's get to who and

14  how the lists of those inspectors were created

15  and what you were involved with.

16                  MS. BRODEUR-McGAN:  Off the

17          record.

18          (Off-record conference)

19                  MS. BRODEUR-McGAN:  Back on

20          the record.

21      Q.      (By Ms. Brodeur-McCan)  This is a

22  clean-up question.  If you could turn to 131 and

23  132, which, for counsel's purpose, is part of --

24  so in your own words, are you familiar with what

1  you're looking at, to the left of the document,

2  under this thing called job, it says 4616?

3       A.     Yes, that's the snow inspecting

4  code.

5       Q.     That's my question.  So 4616 indeed

6  is the snow inspection code?

7       A.     Yes.

8       Q.     And you know that for sure?

9       A.     I do.

10       Q.     Okay.  And then the 0519 code, that

11  is her other job, correct?

12       A.     Yes.

13       Q.     Okay.  And so, can I now read this

14  document and look for any time she's paid under

15  the job code 4616 and determine that she did

16  snow inspection work?

17       A.     Yes.  I found another one.

18       Q.     Okay, good.  183?

19       A.     183.

20             MS. deSOUSA:  Is that page 20?

21             THE WITNESS:  It's page 36.

22       Q.     (By Ms. Brodeur-McGan)  We also

23  have the code 4616, under the date -- and by the

24  way, what is the date on this one?  We may need

1  not created just for the lawsuit, these are

2  payroll records?

3      A.      Yes.

4      Q.      And would you believe that these

5  are reliable copies of the actual documents?

6      A.      Yes.

7      Q.      And does the City typically print

8  these or are these -- is this information

9  typically kept within the Munis system?

10     A.      Kept in the Munis system.

11     Q.      Okay.  Did you ever, in preparation

12 for this case or in preparation for today's

13 deposition, look at these specific documents,

14 148 through 246, to determine how many snow

15 inspector jobs or times Ms. Williams worked?

16     A.      I didn't go through these

17 documents, no.

18     Q.      Okay.  So sitting here today -- and

19 by the way, these only go back to 2012, correct,

20 these Bates Stamp numbers?

21     A.      Yes.

22     Q.      Do you know whether or not she

23 worked as a snow route inspector prior to

24 January 2012?

1        A.      No, I don't.

2        Q.      Do you have an understanding of how

3   many times Ms. Williams worked as a snow route

4   inspector other than what we've just looked at

5   here?

6        A.      No, I don't.  The only days I know

7   of are the ones in February of '14.

8        Q.      Okay.  I don't want to confuse you

9   by the next question.  So prior to coming here

10  today, did you know -- and prior to just looking

11  at this, did you know how many times

12  Ms. Williams worked as a snow route inspector,

13  ever, for the City of Springfield?

14       A.      Just from when I was here.

15       Q.      Okay.  When you were here, meaning

16  when you were at the DPW from 2013 forward, you

17  knew whether or not she worked as a snow route

18  inspector?

19       A.      Correct.

20       Q.      So did you know whether or not she

21  ever worked as a snow route inspector prior to

22  2013?

23       A.      That I do not know.

24       Q.      Okay.  Did you ever ask her or

1    anybody else if she had?

2         A.    No, I did not.

3         Q.    Do you know whether or not you

4    could search the Munis system and ask it to

5    print out all people who ever got paid under

6    code 4616?

7         A.    I would have someone do it, I

8    guess.

9         Q.    But it's doable?

10        A.    It's doable.

11        (Time stamped at 11:56 a.m.)

12             MS. BRODEUR-McGAN:  Please

13        mark that question.

14        (Question marked in Index)

15             MS. BRODEUR-McGAN:  At some

16        point, I am going to ask that the City of

17        Springfield produce the persons paid under

18        code 4616 from the period of 2010 to 2017,

19        which I think is part of Schedule A of the

20        deposition notice anyway, the 30(b)(6), so

21        it's part of what we've already discussed,

22        but I think that's the easier way to find

23        it.

24             MS. deSOUSA:  Okay.  I'll look

1   basically snow costs, who worked.

2        Q.      Okay.  And it says Work Order

3   Details-JPR.  What is JPR?

4        A.      John Rooney.  I don't know his

5   middle name.  He developed this report.

6        Q.      And this report is divided by

7   years, is that fair to say?

8        A.      By storms.  Each storm has its own.

9        Q.      So Bates stamp 311, which is the

10  first one, is a storm that would have been

11  December 17, 2013, that ended December 18,

12  2013 -- strike that.

13              So the first three pieces of paper

14  which are Bates stamp 311, 312 and 313, are from

15  a storm where it says, start date, December 17,

16  2013, that would be the start of a storm,

17  correct?

18       A.      Correct.

19       Q.      And then stop date December 18,

20  2013?

21       A.      Correct.

22       Q.      So this would be one storm?

23       A.      Yes.

24       Q.      And it would be details of who

1   worked that storm?

2       A.     Who worked, who -- yes, who worked

3   and their hours.

4       Q.     Okay.  And can we also determine

5   how much they were paid by looking at the costs

6   column on these documents?

7       A.     Yes.

8       Q.     And we can actually determine how

9   much they were paid based on how many hours they

10  worked, dividing it into the costs column?

11      A.     Yes.

12      Q.     And we could also determine if they

13  were overtime hours or regular hours?

14      A.     Yes.  They are displayed under the

15  columns.

16      Q.     Okay.  Now, I noticed from looking

17  at these Bates stamps 311 through 326, that

18  sometimes names are repeated?

19      A.     The system can only -- it can't

20  take a name and split up the overtime from the

21  regular time, so you have to put it in twice.

22      Q.     Okay.  And on Bates stamp 313,

23  there are two Williams listed on that last page?

24      A.     Yes.

1   fact -- his name is not in the application list

2   of applications that we have?

3       A.      Okay, yes.

4       Q.      And again, you told me there is a

5   set of 2013 applications you believe that

6   existed?

7       A.      I do, I just never found them.

8       Q.      Okay.  Did you circle the names

9   that are on Bates Stamp 314 through 317?

10      A.      Yes.

11      Q.      And why did do you that?

12      A.      To show that they were inspectors.

13      Q.      And why is that relevant?

14      A.      Well, that's what I thought this

15  was about.

16      Q.      Okay.  So are there people that are

17  not inspectors that are listed on 314 through

18  317?

19      A.      Yes, there are.

20      Q.      Okay.  So let me -- I'm not sure I

21  understand this, so let me try to understand a

22  little better.  So 314 through 317 lists

23  everybody who worked a particular storm?

24      A.      Yes.

1    listed on Exhibit 5?

2         A.      Yes.

3         Q.      And backups listed on Exhibit 5?

4         A.      Yes.

5         Q.      And does the document differentiate

6    between the two?

7         A.      No.

8         Q.      Would you be able to look at this

9    and tell me which ones were backup and which

10   ones were primaries for the relevant years

11   listed?

12        A.      Yes.

13        Q.      And how would you be able to tell

14   me that, is it based on something from the

15   document or just from your head?

16        A.      Just from my head.

17        Q.      So basically, it's only in your

18   head who the primaries versus the backup

19   inspectors were for the years listed on Exhibit

20   5?

21        A.      Yes.

22        Q.      Did you ever reduce it to one

23   list -- that was a bad question -- strike that.

24              The list that's in your head that

```
 1    was primary versus backup?

 2         A.      Yes.

 3         Q.      Did you ever reduce that to writing

 4    and differentiate between the two?

 5         A.      Yes.

 6         Q.      And have you seen that list?

 7         A.      Yes.

 8         Q.      Okay.   And do you have that list in

 9    your hand?

10         A.      Yes.

11                 MS. BRODEUR-McGAN:   Let's mark

12         that as Exhibit 6.

13         (Exhibit 6, Revised Inspecting List for

14         2015/16 Season, marked for identification)

15         Q.      (By Ms. Brodeur-McGan)   In your own

16    words, what is Exhibit 6?

17         A.      This was my revised inspecting list

18    for 2015/16 season.

19         Q.      Okay.   And this has the list of

20    primary inspectors and backups?

21         A.      Yes.

22         Q.      And the backups are contained in

23    the left side of this document?

24         A.      Yes.
```

1   Q.     And everybody that's listed under

2   primary in the block was a primary inspector for

3   the 2015 time frame?

4   A.     Yes.

5   Q.     Actually, this document says 2016

6   on the top, do you see that?

7   A.     Right.  That's '16.

8   Q.     So is there a 2015 one?

9   A.     Yes.

10   Q.     I'm going to show you something

11   we've already marked, Exhibit 3.

12   A.     Yes, okay, this is my newest one

13   for '16.

14   Q.     Okay.  So Exhibit 6 is the 2016

15   list.  Exhibit 3 was the 2015 --

16   A.     It should say 15/16 list.

17   Q.     So Exhibit 3 should read 2015 to

18   2016 list?

19   A.     Right.

20   Q.     And Exhibit 6 is just 2016?

21   A.     I didn't put it in, but that was my

22   final list from this past winter, 16/17.

23   Q.     So Exhibit 6 is actually the list

24   for the 2016 to 2017 winter?

1          A.      Yes.

2          Q.      And it was the final list?

3          A.      Yes.

4          Q.      And you did this list, Exhibit 6?

5          A.      Yes.

6          Q.      And Exhibit 3, did you do this list

7   as well?

8          A.      Yes.

9          Q.      Okay.   And when I say, did you do,

10   there's a couple of elements of did you do.   Did

11   you physically type the names or change the

12   names that appeared on Exhibit 3?

13         A.      No.   These were the ones I kept --

14   I was using from before.

15         Q.      I don't understand what you mean.

16   I'm talking about Exhibit 3, which is the 2015

17   to 2016 storm.

18         A.      My years are getting mixed up here.

19              MS. deSOUSA:   Take your time.

20         While he's reviewing what's in front of

21         him, I just want to note that the

22         documents that he's referring to are part

23         of the supplementation that we gave you

24         this morning to interrogatories, this

1        Exhibit 6.

2        Q.       (By Ms. Brodeur-McGan)   So maybe it

3    would help if I restate the original question.

4        A.       Yes, please.

5        Q.       So again, let's step back.   My

6    question was, did you ever do -- you talked

7    about things being in your head -- did you ever

8    do a list of primary inspectors and backup

9    inspectors for relevant years?

10       A.       For relevant years?

11       Q.       For various years.

12       A.       Oh, okay.   I changed everything for

13   16/17.   The only thing I did for 15/16, we had a

14   whole new order of phones come in for all the

15   inspectors to have a city phone, and I changed

16   all the phone numbers.

17                  MS. deSOUSA:   Can we go off

18            the record for a second?

19                  MS. BRODEUR-McGAN:   Sure.

20            (Off-record conference)

21                  MS. BRODEUR-McGAN:   Back on

22            the record.   We're going to break for

23            lunch.

24            (A lunch recess was taken)

```
 1                    MS. BRODEUR-McGAN:  Back on
 2        the record.
 3        (Exhibit 7, Supplemental Documents, Bates
 4        Stamp 353 through 366, marked for
 5        identification)
 6                    MS. BRODEUR-McGAN:  Going back
 7        on the record, before the deposition
 8        started, Attorney deSousa produced
 9        additional draft, unsigned copies of the
10        supplemental interrogatories, with
11        additional documents behind it or attached
12        to it.  I have collectively marked these
13        new materials given to me today, Bates
14        Stamp 353 through 366, and some of these
15        documents attached hereto were already
16        discussed with the witness, and if they
17        were, we marked them separately earlier in
18        today's deposition.  But for purposes of
19        the record, the supplemental production by
20        the defendants on this date is
21        collectively marked as Exhibit 7.
22        Q.     Mr. DeSantis, I've had an
23   opportunity -- I'm going to show you Exhibit 7
24   collectively -- I've had an opportunity to look
```

1  at them and I have some -- just some questions

2  about, you know, how they were created, who

3  created them, and how they were found, if you

4  will, by the defendants for purposes of being

5  produced today.  So what I would like you to do

6  first is to look at them so you can get familiar

7  with what's attached.

8        A.     Okay.

9               MS. BRODEUR-McGAN:  The

10       witness indicates he wants to talk with

11       counsel.  We'll go off the record for a

12       second.

13       (A recess was taken)

14               MS. BRODEUR-McGAN:  Back on

15       the record.

16       Q.     (By Ms. Brodeur-McGan)  Mr.

17  DeSantis, I have to tell you, I'm completely

18  confused, and let me tell you what I'm trying to

19  determine, one way or another, is, I would like

20  to see if there are documents that can reflect

21  who the inspectors were for various years.

22       A.     Okay.

23       Q.     And I'm looking ultimately for the

24  years 2010/11, the snow years, 2010/11, 11/12,

1   12/13, /13/14, 14/15, 15/16, 16/17, okay?  So

2   let me finish this process.  Sitting here today,

3   I do not understand if there is a piece of paper

4   that could show me the list of inspectors for

5   those various years.  So if you can help me

6   figure out if there are papers or documents that

7   can show me the list, if they are accurate, and

8   explain how they were created.

9        A.      Okay.  10/11, and 12, I have to

10  tell you, I don't know.  13/14 is when I

11  inherited, I inherited this sheet.  And this is

12  my list of primary inspectors, in the box.

13       Q.      Okay.  And when you say, this is

14  the list, you're pointing to -- you're picking

15  one of these numbers, Bates Stamp 357, and

16  you're saying that those that are contained in

17  the square box, which is on the left side of

18  357, were your primary inspectors?

19       A.      Yes.

20       Q.      And let me just clarify something

21  else you said.  You said 10, 11 and 12, you

22  don't know?

23       A.      I don't know.

24       Q.      Does that mean the snow year, 10 to

1    11, 11 to 12 and 12 to 13, you don't know?

2         A.      Correct.  I'm assuming these were

3    the guys in place at the time, or the people in

4    place, that's what I'm assuming, I have no idea.

5         Q.      So you don't know?

6         A.      No.

7         Q.      And you said that you're assuming

8    that the names that are in the box, that are

9    listed on 357, were the previous years, 10, 11

10   and 12, but you don't know?

11        A.      That's my assumption, I don't know.

12        Q.      Okay.  And what I'm trying to

13   determine is, did you or anybody, while you were

14   working at the DPW in the year 2013 or

15   thereafter, make changes to who was on the

16   primary list, i.e., in that box, as an

17   example --

18        A.      Right.

19        Q.      -- and changes to either

20   secondaries or backups?

21        A.      No.  I did not make any changes.

22        Q.      For any of the years that we were

23   discussing?

24        A.      For this 2013/14.

```
 1        Q.      So 2013 to 2014, you did not make
 2   any changes to those who were listed as a
 3   primary inspector or those who were listed as a
 4   backup?
 5        A.      Correct.
 6        Q.      Did anybody make changes?
 7        A.      No.
 8        Q.      Did Jean Williams work as a snow
 9   inspector in 2013 to 14?
10        A.      Yes she worked the February
11   snowstorm, the 13th and 14th of February.
12        Q.      Okay.  So because she worked a
13   storm in 2014, can you assume that she was
14   listed as a primary or backup snow inspector in
15   the previous year?
16        A.      I can assume she was listed as a
17   backup.
18        Q.      But you have not seen documents and
19   you don't know for sure?
20        A.      No.  No, 13/14 is what I have.  I
21   don't have anything previous.
22        Q.      So 13 and 14 are what you have, you
23   have nothing for previous years?
24        A.      Correct.
```

1    inspector ever before?

2         A.     He was on -- not that I know of.

3         Q.     Okay.  So Ed Williamson was added

4    to the Bates stamp 359 list as a primary

5    inspector, correct?

6         A.     Correct, yes.

7         Q.     For the 2015/16 snow inspection

8    year, correct?

9         A.     Yes.

10        Q.     And to your knowledge, he had not

11   previously been a snow inspector?

12        A.     No.

13        Q.     And what does Ed Williamson do?

14        A.     He was the foreman that replaced

15   Charles Sumares.  He was promoted.

16        Q.     Okay.  Do you know when he was

17   promoted to foreman?

18        A.     Right after Mr. Sumares retired.

19        Q.     And do you know whether or not

20   Mr. Williamson had originally applied to be a

21   snow inspector?

22        A.     I don't know.  I don't remember

23   seeing his name.

24        Q.     Do you know whether or not Mr. Ed

```
 1  Williamson asked you to be added to the primary
 2  list of inspectors for snow inspectors?
 3       A.      That was part of his promotional
 4  thing -- if he was the foreman, he had to do
 5  snow inspecting.
 6       Q.      Okay.  Tell me more about, what you
 7  mean by that.
 8       A.      I was brought up through the system
 9  a certain way, and when I promote a foreman, I
10  tell him in the interview, you're going to be a
11  snow inspector, that's the way it is.  If you
12  don't want to inspect snow, then you don't want
13  to be a foreman.
14       Q.      So this is going back -- so what
15  you do when you hire a foreman is, you make them
16  a snow inspector, yes?
17       A.      Yes.
18       Q.      And you make them do that job as a
19  snow inspector?
20       A.      Yes.
21       Q.      Which is a separate and discrete
22  job?
23       A.      Yes.
24       Q.      Even if they don't want to be?
```

```
 1          A.      Yes.

 2          Q.      So you actually made Mr. Williamson

 3   be a snow inspector when he had not even

 4   applied?

 5          A.      Right.  He applied for the foreman

 6   job.

 7          Q.      Okay.  And just -- I want to make

 8   sure I'm not inferring something --

 9          A.      Yes.

10          Q.      -- but the way I'm taking this from

11   what you said so far is that Mr. Williamson

12   indeed did not apply to be a snow inspector?

13          A.      I would have to look through the

14   letters.

15          Q.      Okay.  Did he ever say to you that

16   he did not want to be a snow inspector?

17          A.      No.

18          Q.      Did you have a discussion with

19   Mr. Williamson about --

20          A.      Yes.

21                  MS. deSOUSA:  You have to

22          wait.

23          Q.      Did you ever have a specific

24   discussion with Mr. Williamson about whether or
```

 1  not he wanted to do the snow inspector duties?

 2      A.      We talked about it during his

 3  interview, yes.

 4      Q.      And what did he say?

 5      A.      He said he was willing to be a snow

 6  inspector.

 7      Q.      Okay.  But willing to and wanting

 8  to are two separate things.  So did he express

 9  to you a desire for him to want to do those

10  duties?

11      A.      He didn't express a negative

12  reaction to it.

13      Q.      Okay.  But you didn't hear any

14  words that sounded like, I want to do the snow

15  inspector responsibilities?

16      A.      Not to that -- no, not that exact

17  wording.

18      Q.      I'm trying to get a sense of the

19  reality of the conversation you had with

20  Mr. Williamson, and it's fair to say that you

21  told him he has to do this?

22      A.      I put it in the job description as

23  performing.

24      Q.      Okay.  So you said you put it in

1  the job description.  You actually added to the

2  job description for foreman for DPW?

3       A.     Yes.

4       Q.     When do you think you first edited

5  the foreman job description?

6       A.     He probably was the first, because

7  Mr. Sumares was the first foreman to retire

8  under my watch.

9       (Time stamped at 1:55 p.m.)

10            MS. BRODEUR-McGAN:   Please

11      mark that question.

12      (Question marked in Index)

13            MS. BRODEUR-McGAN:   I'm going

14      to ask that you produce the job

15      description for foreman that you actually

16      drafted, that you just referenced in this

17      deposition, okay?

18      Q.     (By Ms. Brodeur-McGan)  So going

19  back to -- well, actually, let's look at this

20  document while we have it in front of us, Bates

21  Stamp 359.  This document does not have

22  Ms. Williams on the document as a backup,

23  correct?

24      A.     Spare inspector, but not under the

1   term backup.

2        Q.       And if Ms. Williams had been listed

3   as a backup inspector, in fact, in the previous

4   year, which is listed on 358, correct?

5        A.       Yes.

6        Q.       Okay.  So just focusing on how

7   Ms. Williams got removed from document 359 as a

8   back up, if you could tell me how that happened?

9        A.       Yes.  She was working with George

10  Larue, who is number -- the 11th name down on

11  357.

12       Q.       Okay.  And that's relevant because?

13       A.       Because he was training her, and

14  when I asked him how she was doing, he told me

15  she wasn't doing what she needed to do.

16       Q.       During training?

17       A.       Yes.  She was pretty much there to

18  be there and didn't care much about what was

19  happening, that's what I was told.

20       Q.       And when were you told that?

21       A.       After the snowstorm.  After he was

22  telling me he was getting ready to retire.

23       Q.       And when was that?

24       A.       After that season also.

1        A.      No.

2        Q.      Did anybody ever tell her that?

3        A.      No.

4        Q.      Why?

5        A.      I don't know.

6        Q.      Were you made aware that

7    Ms. Williams brought a MCAD complaint?

8        A.      Yes.

9        Q.      Did she actually tell you that she

10   believed she was being discriminated against?

11       A.      Yes.

12       Q.      And did you have a face-to-face

13   conversation with her about it?

14       A.      I told her that she needed more

15   training.

16       Q.      I didn't hear that.  I'm sorry?

17       A.      She needed more training.  She also

18   was not going to get called every storm, backups

19   do not always get called, and I explained that

20   to her.  And she wanted to be a primary and I

21   said, you're not ready.

22       Q.      Did you ever tell her that you were

23   going to remove her from the list as a backup

24   because Mr. Larue had issues with things that

1  she did while training?

2      A.      I removed a lot of people from the

3  backup list.  There's a reason for it, and I'm

4  going to tell you why.

5      Q.      You have to answer my question.

6                          MS. deSOUSA:  You have to let

7      her ask the questions.

8                          THE WITNESS:  I get it.

9                          MS. deSOUSA:  You're trying to

10      answer a question she hasn't asked you

11      yet.

12                          THE WITNESS:  I have a hard

13      time with certain -- I'm used to being in

14      charge.  I'm sorry.

15      Q.      (By Ms. Brodeur-McGan)  So my

16  question was, you were having a face-to-face

17  conversation with her about her concerns, and

18  specifically discrimination, correct?

19      A.      Yes.

20      Q.      And you did not tell her that

21  Mr. Larue had some concerns about her

22  performance while training?

23      A.      I didn't say that.  I said she

24  needed more training to be a primary.

```
 1          Q.      Okay.  But you gave me some more
 2   background of what Mr. Larue said about her.
 3          A.      That's what he told me.  I asked
 4   him to put it in writing and he never did.
 5          Q.      Okay.  Well, you were his
 6   supervisor, right?
 7          A.      Yes.
 8          Q.      So why didn't you make him put it
 9   in writing?
10          A.      When I told him to put it in
11   writing, he said he would, and the next thing I
12   know he's retiring.  It wasn't like I had much
13   of a chance to get after him.
14          Q.      Okay.  So you personally removed
15   Ms. Williams from the backup list as a backup
16   inspector?
17          A.      Yes.
18          Q.      And you did that the year that it
19   came in effect, which was which year?
20          A.      '15.
21          Q.      So that would have been the 2015 to
22   2016 snow year?
23          A.      Yes.
24          Q.      Listed on Bates Stamp 359?
```

1      A.      I found out that these individuals

2  were salaried individuals, and they were

3  getting -- besides their salary, they were

4  getting snow rate, snow inspector rate.

5      Q.      Okay.  So they were actually

6  getting double paid?

7      A.      Yes.

8      Q.      And when did you first learn that?

9      A.      It was before the winter of 15/16.

10      Q.      So before the winter of 15/16?

11      A.      No, no, I'm sorry, this one here,

12  14/15.

13      Q.      So before the winter of 14/15?

14      A.      Yes.

15      Q.      You learned that certain

16  individuals were salaried and so when they

17  performed this snow inspector role, they were

18  actually getting paid on top of the pay that

19  they're getting from another source, like

20  getting paid twice?

21      A.      Yes.

22      Q.      Okay.  And can you tell me, looking

23  at 359, the names of those individuals that were

24  salaried that you could not use for snow

```
 1  inspectors?

 2       A.      Phil Dromey, Mark Hebert.

 3       Q.      Are they listed somewhere?

 4       A.      Yes, they're on the side bar here.

 5       Q.      So some of these names say, did not

 6  use?

 7       A.      Yes.

 8       Q.      Do all the ones that say, did not

 9  use, were they salary?

10       A.      Yes.

11       Q.      So if I'm looking --

12       A.      And Phil Dromey should have been.

13  It's right under, did not use, here.

14       Q.      Okay.  So Fran Connors, salary?

15       A.      Yes.

16       Q.      Tom McCall, salary?

17       A.      Yes.

18       Q.      Bobby Williams, salary?

19       A.      Yes.

20       Q.      Phil Dromey, salary?

21       A.      Yes.

22       Q.      Mark Hebert, salary?

23       A.      Right.  And down at the bottom,

24  David Carter, he's salary.  I couldn't use him
```

1  inspectors, period?

2        A.      Yes.

3        Q.      And you found that out before the

4  14/15 snow season?

5        A.      Yes.

6        Q.      And how did you find that out?

7        A.      It was through the administration

8  with Chris Cignoli.  He was telling me that they

9  were salaried employees and they're not supposed

10  to be getting inspector pay also.

11        Q.      And was there any discipline to

12  those people, did they know they were double

13  dipping?

14        A.      No, they were doing it under the

15  last administration, and no one said anything to

16  them.

17        Q.      Okay.  And did you personally tell

18  them, at some point, that they couldn't be paid

19  separately for doing snowplow inspections?

20        A.      Mr. Cignoli told them.

21        Q.      Okay.  Now, before I forget, we've

22  talked about primary inspectors, those are the

23  people in the box?

24        A.      Mm-hmm.

1   anyways, so I'm just going to do a couple of

2   other things.  So can you look at, also in

3   Exhibit 7, Bates 363, and do you know what that

4   document is?

5          A.      It's a payroll adjustment sheet.

6          Q.      Okay.  And what it is used for?

7          A.      It was to show snow inspectors out

8   of the department that worked on these

9   particular snowstorms in 2012 and 2013.

10         Q.      Okay.  So this here has a date on

11  the top of December 29, 2012, correct?

12         A.      Yes.

13         Q.      And it says, adjustment

14  description, and then it says, next to

15  everybody's names, trained as snowplow

16  inspector, 25 dollars an hour, do you see that?

17         A.      Yes.

18         Q.      So what does that mean?

19         A.      I don't know, but I assume they

20  were trained as snow inspectors at 25 dollars

21  and hour.

22         Q.      Okay.  And they were paid for that?

23         A.      Yes.

24         Q.      For instance, Dave Cotter

```
 1    was trained as a snow inspector for 11 hours at
 2    25 dollars an hour?
 3          A.      Yes.
 4          Q.      And then there's an earnings code
 5    of 903?
 6          A.      That's what it says, yes.
 7          Q.      Do you know what that earnings code
 8    is for?
 9          A.      No, I don't.
10          Q.      Do you know who trained these
11    people?
12          A.      No, I don't.
13          Q.      Do you know if it was the same
14    person?
15          A.      I don't know.
16          Q.      Do you know which year they were
17    trained in?
18          A.      This was before me.  No, I don't.
19                  MS. BRODEUR-McGAN:  For
20          Attorney deSousa's benefit, one of the
21          supplemental questions will be based on
22          this conversation, at 2:35, at the end of
23          the depo, and I'll put it in the letter.
24          Q.      (By Ms. Brodeur-McGan)  So do you
```

1       Q.      You have hard documents in the

2   computer?

3       A.      No, hard documents.

4       Q.      Oh, so you have hard documents and

5   computer access?

6       A.      Correct.

7       Q.      So what do you physically -- what

8   would you be able to look up to help you make

9   that list?

10      A.      I'm going to have to see when the

11  -- I'm going to have to look up and see when

12  they were going and who they were with.  I have

13  a few that I know off the top of my head, but

14  it's not going be -- if you want them.

15      Q.      Yes, I'll take some off the top of

16  your head.

17      A.      Luca Mineo and Connor Knightly.

18      Q.      Were those people trained or

19  trainers?

20      A.      They were trained.  And Tyrone

21  Holt.

22      Q.      And he was trained?

23      A.      Yes.  They had to go out for a full

24  season with someone.

```
 1         Q.      And who else?

 2         A.      And Eddie Williamson.

 3         Q.      He had to be trained?

 4         A.      He was trained, yes.

 5         Q.      And those four names you just

 6    thought of off the top of your head, they were

 7    trained since you started, which was October of

 8    2003, to present?

 9         A.      2013.

10         Q.      So they were all trained in 2013?

11         A.      Yes.

12               MS. deSOUSA:  No, I think she

13         was correcting you because you said 2003.

14         So he's not indicating that it was -- that

15         all the training was done in 2013.

16         Q.      (By Ms. Brodeur-McGan)  Okay.  So

17    the four people you just mentioned that were

18    trained, which years were they trained in?

19         A.      Eddie Williamson was the 14/15

20    season.  Also, Connor Knightly was trained prior

21    to that, the 13/14 season.  And Luca Mineo was

22    trained in 13/14 -- wait a minute, let me just

23    doublecheck.  Yes, Luca Mineo was trained in

24    13/14.
```

1          Q.        How about Connor Knightly?

2          A.        Same thing.

3          Q.        And then, how about Tyrone Holt?

4          A.        That was the 14/15 season -- I'm

5     sorry, 15/16.

6          Q.        Did you make any attempts, you, to

7     have Ms. Williams trained at all, ever, since

8     you've been deputy director?

9          A.        Just the 13/14 season.

10         Q.        And that you've already referenced

11    with Mr. Larue?

12         A.        Yes.

13         Q.        And can I show you what I'm talking

14    about -- remember I mentioned that Mr. Larue

15    didn't have time or couldn't train Ms. Williams?

16         A.        Sure.

17         Q.        Exhibit 4, Page 4 of 7, and if you

18    could read -- feel free to read the statement,

19    but I'm really interested in the answer down

20    here.

21         A.        Which section?

22         Q.        The second paragraph.  And after

23    you read it to yourself, I'll read it out loud

24    and state the question.

```
 1          A.      Answer number 6, is that what
 2   you're saying?
 3          Q.      Let me show you.   I want you to
 4   read this.
 5          A.      Oh, okay.
 6          Q.      So I'm going to read something out
 7   loud and ask you a question.  So page 4 of 7, so
 8   page 4 of Exhibit 4, marked today, has an answer
 9   of the defendant, given to the MCAD, and says,
10   "As further answering, George Larue was the
11   primary inspector who was training the
12   complainant.  That training began during the
13   2012/13 winter season.  During the first storms
14   of the 13/14 winter season, he was out and could
15   neither inspect nor train the complainant."  So
16   my question is, do you know that Mr. Larue was
17   out during the 13/14 season and could not train
18   and/or inspect the work of Ms. Williams?
19          A.      I would have to look it up.   I
20   don't know that for sure.
21          Q.      Do you know -- remember, you did
22   sign this document, right, your signature is on
23   here?
24          A.      I do.
```

1          Q.     And do you remember reading that

2    before?

3          A.     No.

4          Q.     Do you know where that information

5    came from?

6          A.     No.

7          Q.     Do you know who would know where

8    that information came from?

9          A.     That could have been Mario.  Like I

10   said, we were working on it together.

11         Q.     Do you remember Mr. Larue being out

12   during the entire winter season, as listed?

13         A.     He wasn't out during the entire

14   winter season.

15         Q.     Okay.

16         A.     He might have been out the first

17   storm of 2013/14, but he trained her on January

18   3, 2014.

19         Q.     Okay.  So do you have any idea what

20   that means?

21                MS. deSOUSA:  I think what

22         he's referring to, for the record, is the

23         part reading during the first storm of the

24         2013/14 winter season.

```
 1        A.        He was out, okay, but he was back
 2   by January, which was the same season.
 3        Q.        So on page 5 of 7, I'm going to
 4   read this, it says, "He felt that she needed
 5   more training before she could go out on her
 6   own.  That training took place and was completed
 7   when the complainant and Mr. Larue went out
 8   together in response to snowfall on January 3,
 9   2014."
10        A.        Right.
11        Q.        Did I read that accurately?
12        A.        Yes.
13        Q.        Was her training completed on
14   January 3, 2014?
15        A.        Not that I felt, no.
16        Q.        Okay.  But this document says her
17   training was completed on January 3, 2014,
18   correct?
19        A.        That's what it says, yes.
20        Q.        Do you have any reason to believe
21   that it's inaccurate?
22        A.        I might have misread it.  I don't
23   know.
24        Q.        Okay.  Well, sitting here today --
```

1          MS. deSOUSA:  I'm going to ask

2      that he be allowed to read the entire

3      paragraph.

4      A.      You're assuming that completed

5   means that she was fully trained.  That's not

6   what that says, from my look.  It says training

7   took place and was completed on this snowstorm.

8   That doesn't mean that her training was

9   completed, that particular day was.  That's how

10  I read it.

11     Q.      So the sentence that says that the

12  training took place and was completed when the

13  complainant and Mr. Larue went out together in

14  response to snowfall on January 3, 2014, does

15  not mean that her training was completed on

16  January 3, 2014?

17     A.      That's how I read it.

18     Q.      Okay.  So was there additional

19  training that she had after January 3, 2014 that

20  you were aware of?

21     A.      February 14, 2014.

22     Q.      Okay.  And do you know who did

23  that?

24     A.      Mr. Larue.

1    Q.    (By Ms. Brodeur-McGan)  Let me

2  rephrase this.  There's nothing in the

3  documentation that was given to the MCAD that

4  memorialized that you inspected Ms. Williams'

5  inspection work after the storm of February 14,

6  2014 and you felt she had done a poor job?

7    A.    Correct.  They didn't ask me that.

8  I responded to the questions they asked me.

9    Q.    Okay.  So did you remove

10  Ms. Williams as an inspector because she had

11  done a poor job?

12    A.    No, I removed her because I was

13  trying to get people with a base skill back into

14  the system like it used to be.  People that knew

15  the roads, people that deal with vendors, people

16  that deal with contractors, people that deal

17  with complaints, people that deal with resident

18  complaints.

19    Q.    And how did you accomplish that?

20    A.    By going with foremen, working

21  foremen, code enforcers who have to deal with

22  irate people every day, who know the streets

23  better than anybody, people that are always

24  there.  That's how I went by.

DeSantis Vincent

```
 1          A.      I added Connor Knightly, Luca
 2    Mineo, Tyrone Holt.
 3          Q.      And who else?
 4          A.      Nobody.
 5          Q.      And when did you add them?
 6          A.      After the 2014 season.
 7          Q.      So after 2014/15 snow season?
 8          A.      Hang on.  At different times.  A
 9    couple of them were -- Luca and Connor were
10    2014/15.  Tyrone was not until 2015/16, and
11    Eddie was right after Mr. Sumares retired in
12    2014.
13          Q.      And they had to be trained?
14          A.      Yes.
15          Q.      And you had to pay them to train?
16          A.      Yes.
17          Q.      Okay.  Did you ever consider
18    training Jean Williams properly to do the
19    function of snow inspector?
20          A.      No.
21          Q.      Why not?
22          A.      I just didn't.
23          Q.      Okay.  And the list on 363 of
24    people that were trained, it says, trained as
```

1   snow inspector?

2         A.      Yes.

3         Q.      Ms. Williams' name is not on here?

4         A.      They are out of the DPW Department,

5   that's why.

6         Q.      Okay.  If you could look at 364,

7   just tell me what that document is?

8         A.      It's entitled the same, it's for

9   out of department employees.

10        Q.      So it's entitled One Time Payroll

11  Adjustment?

12        A.      Right.

13        Q.      So do you believe this is the same

14  thing as 363, the list of people trained to do

15  snowplow inspecting that were not part of the

16  DPW?

17        A.      Correct.  It looks like they

18  changed some of the columns from 2012 to 2013

19  and added a Munis code and a pay rate.

20        Q.      And the earnings code, do you think

21  that's a training code, the 903?

22        A.      I don't.  I wouldn't -- that would

23  be speculating.  I don't know.

24        Q.      And this training list for outside

1    wanted to hire for that posting?

2         A.      Correct.

3         Q.      You only assume they were going to

4    do 20 and 20 because it's logical?

5         A.      Correct.

6         Q.      And you have not had specific

7    conversations with anybody about that?

8         A.      No.

9         Q.      Now, do you remember the 2013

10   posting?

11        A.      Yes.

12        Q.      That did list 20 and 20, correct?

13        A.      I would have to see that.

14        Q.      Let's find it.

15                MS. deSOUSA:  So can I just

16        stop you for a minute?

17                MS. BRODEUR-McGAN:  Sure.

18                MS. deSOUSA:  The answer to --

19        the question that this respondent's

20        position statement is answering

21        specifically references the October

22        posting.

23                MS. BRODEUR-McGAN:  Okay.  But

24        the answer says other things, like it

1              talks about other things.

2                        MS. deSOUSA:  Okay.  But I

3         just --

4                        MS. BRODEUR-McGAN:  That's why

5         I wanted him to read the whole thing, and

6         maybe that's the explanation of why it

7         reads one way and they think it means

8         something else.  But when I read it, I

9         read it to mean something different.  So

10        that's why I'm giving him the opportunity

11        to read the whole thing in answering.

12                        MS. deSOUSA:  Okay.

13        Q.    (By Ms. Brodeur-McGan)  So Bates

14   Stamp 139 and 140 are the -- and they're here --

15   139 is the September 2012 job description, if

16   you will, correct?

17        A.    Yes.

18        Q.    And that doesn't say anything about

19   numbers of snow inspectors?

20        A.    No.  It's just the job description.

21        Q.    And 140 is the posting?

22        A.    For 2013, yes.

23        Q.    And it has 40 intermittent snow

24   inspectors, correct?

1       A.    Yes.

2       Q.    And then in the body of this

3 document, 140, it talks about 20 primary and 20

4 backup?

5       A.    Yes.

6       Q.    And you were at the department at

7 this time, October of 2013, when this would have

8 been posted, correct?

9       A.    Yes.

10      Q.    And did you have discussions about

11 how this was going to be worded or drafted?

12      A.    No, I was here four days when this

13 was posted.

14      Q.    Okay.  You had only been there for

15 four days?

16      A.    Yes.

17      Q.    Four days before you joined DPW and

18 then this was posted?

19      A.    Yes.

20      Q.    And you did not participate in any

21 discussions about why it was going to be 20 and

22 20?

23      A.    No.

24      Q.    And you didn't give any input on

1    that?

2         A.      No, no one asked.

3         Q.      And you don't have any -- you don't

4    have any information that you can tell me as to

5    why it was 20 and 20 that was created?

6         A.      No, just what I -- just by logical

7    deduction, I guess.

8         Q.      Okay.  If you could look at 141.

9    141 is a posting from October of 2012, correct?

10        A.      Correct.

11        Q.      And this does say 40 snow route

12   inspectors, correct?

13        A.      Yes.

14        Q.      And it does not talk about primary

15   or secondary?

16        A.      No.

17        Q.      Okay.  And did you ever count the

18   applications that you got in 2012 for this

19   posting?

20        A.      I did.  I don't remember the

21   number.

22        Q.      Do you remember there were 39

23   people that applied?

24        A.      Yes.