# EXHIBIT NN

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

## § 1606.8 Harassment.

(a) The Commission has consistently held that harassment on the basis of national origin is a violation of title VII. An employer has an affirmative duty to maintain a working environment free of harassment on the basis of national origin.[8]

(b) Ethnic slurs and other verbal or physical conduct relating to an individual's national origin constitute harassment when this conduct:

(1) Has the purpose or effect of creating an intimidating, hostile or offensive working environment;

(2) Has the purpose or effect of unreasonably interfering with an individual's work performance; or

(3) Otherwise adversely affects an individual's employment opportunities.

(c) [Reserved]

(d) With respect to conduct between fellow employees, an employer is responsible for acts of harassment in the workplace on the basis of national origin, where the employer, its agents or supervisory employees, knows or should have known of the conduct, unless the employer can show that it took immediate and appropriate corrective action.

(e) An employer may also be responsible for the acts of non-employees with respect to harassment of employees in the workplace on the basis of national origin, where the employer, its agents or supervisory employees, knows or should have known of the conduct and fails to take immediate and appropriate corrective action. In reviewing these cases, the Commission will consider the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of such non-employees.

---

[8] See CD CL68–12–431 EU (1969), CCH EEOC Decisions ¶6085, 2 FEP Cases 295; CD 72–0621 (1971), CCH EEOC Decisions ¶6311, 4 FEP Cases 312; CD 72–1561 (1972), CCH EEOC Decisions ¶6354, 4 FEP Cases 852; CD 74–05 (1973), CCH EEOC Decisions ¶6387, 6 FEP Cases 834; CD 76–41 (1975), CCH EEOC Decisions ¶6632. See also, Amendment to *Guidelines on Discrimination Because of Sex*, §1604.11(a) n. 1, 45 FR 7476 sy 74677 (November 10, 1980).

APPENDIX A TO § 1606.8—BACKGROUND INFORMATION

The Commission has rescinded §1606.8(c) of the Guidelines on National Origin Harassment, which set forth the standard of employer liability for harassment by supervisors. That section is no longer valid, in light of the Supreme Court decisions in *Burlington Industries, Inc.* v. *Ellerth,* 524 U.S. 742 (1998), and *Faragher* v. *City of Boca Raton,* 524 U.S. 775 (1998). The Commission has issued a policy document that examines the Faragher and Ellerth decisions and provides detailed guidance on the issue of vicarious liability for harassment by supervisors. EEOC Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors (6/18/99), EEOC Compliance Manual (BNA), N:4075 [Binder 3]; also available through EEOC's web site, at *www.eeoc.gov.,* or by calling the EEOC Publications Distribution Center, at 1–800–669–3362 (voice), 1–800–800–3302 (TTY).

[45 FR 85635, Dec. 29, 1980, as amended at 64 FR 58334, Oct. 29, 1999]

## PART 1607—UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES (1978)

### GENERAL PRINCIPLES

Sec.
1607.1  Statement of purpose.
1607.2  Scope.
1607.3  Discrimination defined: Relationship between use of selection procedures and discrimination.
1607.4  Information on impact.
1607.5  General standards for validity studies.
1607.6  Use of selection procedures which have not been validated.
1607.7  Use of other validity studies.
1607.8  Cooperative studies.
1607.9  No assumption of validity.
1607.10  Employment agencies and employment services.
1607.11  Disparate treatment.
1607.12  Retesting of applicants.
1607.13  Affirmative action.

### TECHNICAL STANDARDS

1607.14  Technical standards for validity studies.

### DOCUMENTATION OF IMPACT AND VALIDITY EVIDENCE

1607.15  Documentation of impact and validity evidence.

### DEFINITIONS

1607.16  Definitions.

**Equal Employment Opportunity Comm.**                           **§ 1607.2**

APPENDIX

1607.17  Policy statement on affirmative action (see section 13B).
1607.18  Citations.

AUTHORITY: Secs. 709 and 713, Civil Rights Act of 1964 (78 Stat. 265) as amended by the Equal Employment Opportunity Act of 1972 (Pub. L. 92–261); 42 U.S.C. 2000e–8, 2000e–12.

SOURCE: 43 FR 38295, 38312, Aug. 25, 1978, unless otherwise noted.

GENERAL PRINCIPLES

## § 1607.1  Statement of purpose.

A. *Need for uniformity—Issuing agencies.* The Federal government's need for a uniform set of principles on the question of the use of tests and other selection procedures has long been recognized. The Equal Employment Opportunity Commission, the Civil Service Commission, the Department of Labor, and the Department of Justice jointly have adopted these uniform guidelines to meet that need, and to apply the same principles to the Federal Government as are applied to other employers.

B. *Purpose of guidelines.* These guidelines incorporate a single set of principles which are designed to assist employers, labor organizations, employment agencies, and licensing and certification boards to comply with requirements of Federal law prohibiting employment practices which discriminate on grounds of race, color, religion, sex, and national origin. They are designed to provide a framework for determining the proper use of tests and other selection procedures. These guidelines do not require a user to conduct validity studies of selection procedures where no adverse impact results. However, all users are encouraged to use selection procedures which are valid, especially users operating under merit principles.

C. *Relation to prior guidelines.* These guidelines are based upon and supersede previously issued guidelines on employee selection procedures. These guidelines have been built upon court decisions, the previously issued guidelines of the agencies, and the practical experience of the agencies, as well as the standards of the psychological profession. These guidelines are intended to be consistent with existing law.

## § 1607.2  Scope.

A. *Application of guidelines.* These guidelines will be applied by the Equal Employment Opportunity Commission in the enforcement of title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972 (hereinafter "title VII"); by the Department of Labor, and the contract compliance agencies until the transfer of authority contemplated by the President's Reorganization Plan No. 1 of 1978, in the administration and enforcement of Executive Order 11246, as amended by Executive Order 11375 (hereinafter "Executive Order 11246"); by the Civil Service Commission and other Federal agencies subject to section 717 of title VII; by the Civil Service Commission in exercising its responsibilities toward State and local governments under section 208(b)(1) of the Intergovernmental-Personnel Act; by the Department of Justice in exercising its responsibilities under Federal law; by the Office of Revenue Sharing of the Department of the Treasury under the State and Local Fiscal Assistance Act of 1972, as amended; and by any other Federal agency which adopts them.

B. *Employment decisions.* These guidelines apply to tests and other selection procedures which are used as a basis for any employment decision. Employment decisions include but are not limited to hiring, promotion, demotion, membership (for example, in a labor organization), referral, retention, and licensing and certification, to the extent that licensing and certification may be covered by Federal equal employment opportunity law. Other selection decisions, such as selection for training or transfer, may also be considered employment decisions if they lead to any of the decisions listed above.

C. *Selection procedures.* These guidelines apply only to selection procedures which are used as a basis for making employment decisions. For example, the use of recruiting procedures designed to attract members of a particular race, sex, or ethnic group, which were previously denied employment opportunities or which are currently underutilized, may be necessary to bring an employer into compliance with Federal law, and is frequently an

211

essential element of any effective affirmative action program; but recruitment practices are not considered by these guidelines to be selection procedures. Similarly, these guidelines do not pertain to the question of the lawfulness of a seniority system within the meaning of section 703(h), Executive Order 11246 or other provisions of Federal law or regulation, except to the extent that such systems utilize selection procedures to determine qualifications or abilities to perform the job. Nothing in these guidelines is intended or should be interpreted as discouraging the use of a selection procedure for the purpose of determining qualifications or for the purpose of selection on the basis of relative qualifications, if the selection procedure had been validated in accord with these guidelines for each such purpose for which it is to be used.

D. *Limitations.* These guidelines apply only to persons subject to title VII, Executive Order 11246, or other equal employment opportunity requirements of Federal law. These guidelines do not apply to responsibilities under the Age Discrimination in Employment Act of 1967, as amended, not to discriminate on the basis of age, or under sections 501, 503, and 504 of the Rehabilitation Act of 1973, not to discriminate on the basis of handicap.

E. *Indian preference not affected.* These guidelines do not restrict any obligation imposed or right granted by Federal law to users to extend a preference in employment to Indians living on or near an Indian reservation in connection with employment opportunities on or near an Indian reservation.

### § 1607.3 Discrimination defined: Relationship between use of selection procedures and discrimination.

A. *Procedure having adverse impact constitutes discrimination unless justified.* The use of any selection procedure which has an adverse impact on the hiring, promotion, or other employment or membership opportunities of members of any race, sex, or ethnic group will be considered to be discriminatory and inconsistent with these guidelines, unless the procedure has been validated in accordance with

these guidelines, or the provisions of section 6 below are satisfied.

B. *Consideration of suitable alternative selection procedures.* Where two or more selection procedures are available which serve the user's legitimate interest in efficient and trustworthy workmanship, and which are substantially equally valid for a given purpose, the user should use the procedure which has been demonstrated to have the lesser adverse impact. Accordingly, whenever a validity study is called for by these guidelines, the user should include, as a part of the validity study, an investigation of suitable alternative selection procedures and suitable alternative methods of using the selection procedure which have as little adverse impact as possible, to determine the appropriateness of using or validating them in accord with these guidelines. If a user has made a reasonable effort to become aware of such alternative procedures and validity has been demonstrated in accord with these guidelines, the use of the test or other selection procedure may continue until such time as it should reasonably be reviewed for currency. Whenever the user is shown an alternative selection procedure with evidence of less adverse impact and substantial evidence of validity for the same job in similar circumstances, the user should investigate it to determine the appropriateness of using or validating it in accord with these guidelines. This subsection is not intended to preclude the combination of procedures into a significantly more valid procedure, if the use of such a combination has been shown to be in compliance with the guidelines.

### § 1607.4 Information on impact.

A. *Records concerning impact.* Each user should maintain and have available for inspection records or other information which will disclose the impact which its tests and other selection procedures have upon employment opportunities of persons by identifiable race, sex, or ethnic group as set forth in paragraph B of this section, in order to determine compliance with these guidelines. Where there are large numbers of applicants and procedures are

**Equal Employment Opportunity Comm.** §1607.4

administered frequently, such information may be retained on a sample basis, provided that the sample is appropriate in terms of the applicant population and adequate in size.

B. *Applicable race, sex, and ethnic groups for recordkeeping.* The records called for by this section are to be maintained by sex, and the following races and ethnic groups: Blacks (Negroes), American Indians (including Alaskan Natives), Asians (including Pacific Islanders), Hispanic (including persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish origin or culture regardless of race), whites (Caucasians) other than Hispanic, and totals. The race, sex, and ethnic classifications called for by this section are consistent with the Equal Employment Opportunity Standard Form 100, Employer Information Report EEO–1 series of reports. The user should adopt safeguards to insure that the records required by this paragraph are used for appropriate purposes such as determining adverse impact, or (where required) for developing and monitoring affirmative action programs, and that such records are not used improperly. See sections 4E and 17(4), below.

C. *Evaluation of selection rates. The "bottom line."* If the information called for by sections 4A and B above shows that the total selection process for a job has an adverse impact, the individual components of the selection process should be evaluated for adverse impact. If this information shows that the total selection process does not have an adverse impact, the Federal enforcement agencies, in the exercise of their administrative and prosecutorial discretion, in usual circumstances, will not expect a user to evaluate the individual components for adverse impact, or to validate such individual components, and will not take enforcement action based upon adverse impact of any component of that process, including the separate parts of a multipart selection procedure or any separate procedure that is used as an alternative method of selection. However, in the following circumstances the Federal enforcement agencies will expect a user to evaluate the individual components for adverse impact and

may, where appropriate, take enforcement action with respect to the individual components:

(1) Where the selection procedure is a significant factor in the continuation of patterns of assignments of incumbent employees caused by prior discriminatory employment practices, (2) where the weight of court decisions or administrative interpretations hold that a specific procedure (such as height or weight requirements or no-arrest records) is not job related in the same or similar circumstances. In unusual circumstances, other than those listed in (1) and (2) of this paragraph, the Federal enforcement agencies may request a user to evaluate the individual components for adverse impact and may, where appropriate, take enforcement action with respect to the individual component.

D. *Adverse impact and the "four-fifths rule."* A selection rate for any race, sex, or ethnic group which is less than four-fifths (⅘) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact. Smaller differences in selection rate may nevertheless constitute adverse impact, where they are significant in both statistical and practical terms or where a user's actions have discouraged applicants disproportionately on grounds of race, sex, or ethnic group. Greater differences in selection rate may not constitute adverse impact where the differences are based on small numbers and are not statistically significant, or where special recruiting or other programs cause the pool of minority or female candidates to be atypical of the normal pool of applicants from that group. Where the user's evidence concerning the impact of a selection procedure indicates adverse impact but is based upon numbers which are too small to be reliable, evidence concerning the impact of the procedure over a longer period of time and/or evidence concerning the impact which the selection procedure had when used in the same manner in similar circumstances elsewhere may be

213

considered in determining adverse impact. Where the user has not maintained data on adverse impact as required by the documentation section of applicable guidelines, the Federal enforcement agencies may draw an inference of adverse impact of the selection process from the failure of the user to maintain such data, if the user has an underutilization of a group in the job category, as compared to the group's representation in the relevant labor market or, in the case of jobs filled from within, the applicable work force.

E. *Consideration of user's equal employment opportunity posture.* In carrying out their obligations, the Federal enforcement agencies will consider the general posture of the user with respect to equal employment opportunity for the job or group of jobs in question. Where a user has adopted an affirmative action program, the Federal enforcement agencies will consider the provisions of that program, including the goals and timetables which the user has adopted and the progress which the user has made in carrying out that program and in meeting the goals and timetables. While such affirmative action programs may in design and execution be race, color, sex, or ethnic conscious, selection procedures under such programs should be based upon the ability or relative ability to do the work.

(Approved by the Office of Management and Budget under control number 3046–0017)

(Pub. L. 96–511, 94 Stat. 2812 (44 U.S.C. 3501 *et seq.*))

[43 FR 38295, 38312, Aug. 25, 1978, as amended at 46 FR 63268, Dec. 31, 1981]

§ 1607.5  General standards for validity studies.

A. *Acceptable types of validity studies.* For the purposes of satisfying these guidelines, users may rely upon criterion-related validity studies, content validity studies or construct validity studies, in accordance with the standards set forth in the technical standards of these guidelines, section 14 below. New strategies for showing the validity of selection procedures will be evaluated as they become accepted by the psychological profession.

B. *Criterion-related, content, and construct validity.* Evidence of the validity of a test or other selection procedure by a criterion-related validity study should consist of empirical data demonstrating that the selection procedure is predictive of or significantly correlated with important elements of job performance. See section 14B below. Evidence of the validity of a test or other selection procedure by a content validity study should consist of data showing that the content of the selection procedure is representative of important aspects of performance on the job for which the candidates are to be evaluated. See 14C below. Evidence of the validity of a test or other selection procedure through a construct validity study should consist of data showing that the procedure measures the degree to which candidates have identifiable characteristics which have been determined to be important in successful performance in the job for which the candidates are to be evaluated. See section 14D below.

C. *Guidelines are consistent with professional standards.* The provisions of these guidelines relating to validation of selection procedures are intended to be consistent with generally accepted professional standards for evaluating standardized tests and other selection procedures, such as those described in the Standards for Educational and Psychological Tests prepared by a joint committee of the American Psychological Association, the American Educational Research Association, and the National Council on Measurement in Education (American Psychological Association, Washington, DC, 1974) (hereinafter "A.P.A. Standards") and standard textbooks and journals in the field of personnel selection.

D. *Need for documentation of validity.* For any selection procedure which is part of a selection process which has an adverse impact and which selection procedure has an adverse impact, each user should maintain and have available such documentation as is described in section 15 below.

E. *Accuracy and standardization.* Validity studies should be carried out under conditions which assure insofar as possible the adequacy and accuracy

of the research and the report. Selection procedures should be administered and scored under standardized conditions.

F. *Caution against selection on basis of knowledges, skills, or ability learned in brief orientation period.* In general, users should avoid making employment decisions on the basis of measures of knowledges, skills, or abilities which are normally learned in a brief orientation period, and which have an adverse impact.

G. *Method of use of selection procedures.* The evidence of both the validity and utility of a selection procedure should support the method the user chooses for operational use of the procedure, if that method of use has a greater adverse impact than another method of use. Evidence which may be sufficient to support the use of a selection procedure on a pass/fail (screening) basis may be insufficient to support the use of the same procedure on a ranking basis under these guidelines. Thus, if a user decides to use a selection procedure on a ranking basis, and that method of use has a greater adverse impact than use on an appropriate pass/fail basis (see section 5H below), the user should have sufficient evidence of validity and utility to support the use on a ranking basis. See sections 3B, 14B (5) and (6), and 14C (8) and (9).

H. *Cutoff scores.* Where cutoff scores are used, they should normally be set so as to be reasonable and consistent with normal expectations of acceptable proficiency within the work force. Where applicants are ranked on the basis of properly validated selection procedures and those applicants scoring below a higher cutoff score than appropriate in light of such expectations have little or no chance of being selected for employment, the higher cutoff score may be appropriate, but the degree of adverse impact should be considered.

I. *Use of selection procedures for higher level jobs.* If job progression structures are so established that employees will probably, within a reasonable period of time and in a majority of cases, progress to a higher level, it may be considered that the applicants are being evaluated for a job or jobs at the higher level. However, where job progression is not so nearly automatic, or the time span is such that higher level jobs or employees' potential may be expected to change in significant ways, it should be considered that applicants are being evaluated for a job at or near the entry level. A "reasonable period of time" will vary for different jobs and employment situations but will seldom be more than 5 years. Use of selection procedures to evaluate applicants for a higher level job would not be appropriate:

(1) If the majority of those remaining employed do not progress to the higher level job;

(2) If there is a reason to doubt that the higher level job will continue to require essentially similar skills during the progression period; or

(3) If the selection procedures measure knowledges, skills, or abilities required for advancement which would be expected to develop principally from the training or experience on the job.

J. *Interim use of selection procedures.* Users may continue the use of a selection procedure which is not at the moment fully supported by the required evidence of validity, provided: (1) The user has available substantial evidence of validity, and (2) the user has in progress, when technically feasible, a study which is designed to produce the additional evidence required by these guidelines within a reasonable time. If such a study is not technically feasible, see section 6B. If the study does not demonstrate validity, this provision of these guidelines for interim use shall not constitute a defense in any action, nor shall it relieve the user of any obligations arising under Federal law.

K. *Review of validity studies for currency.* Whenever validity has been shown in accord with these guidelines for the use of a particular selection procedure for a job or group of jobs, additional studies need not be performed until such time as the validity study is subject to review as provided in section 3B above. There are no absolutes in the area of determining the currency of a validity study. All circumstances concerning the study, including the validation strategy used, and changes in the relevant labor market and the job

should be considered in the determination of when a validity study is outdated.

§ 1607.6 Use of selection procedures which have not been validated.

A. *Use of alternate selection procedures to eliminate adverse impact.* A user may choose to utilize alternative selection procedures in order to eliminate adverse impact or as part of an affirmative action program. See section 13 below. Such alternative procedures should eliminate the adverse impact in the total selection process, should be lawful and should be as job related as possible.

B. *Where validity studies cannot or need not be performed.* There are circumstances in which a user cannot or need not utilize the validation techniques contemplated by these guidelines. In such circumstances, the user should utilize selection procedures which are as job related as possible and which will minimize or eliminate adverse impact, as set forth below.

(1) *Where informal or unscored procedures are used.* When an informal or unscored selection procedure which has an adverse impact is utilized, the user should eliminate the adverse impact, or modify the procedure to one which is a formal, scored or quantified measure or combination of measures and then validate the procedure in accord with these guidelines, or otherwise justify continued use of the procedure in accord with Federal law.

(2) *Where formal and scored procedures are used.* When a formal and scored selection procedure is used which has an adverse impact, the validation techniques contemplated by these guidelines usually should be followed if technically feasible. Where the user cannot or need not follow the validation techniques anticipated by these guidelines, the user should either modify the procedure to eliminate adverse impact or otherwise justify continued use of the procedure in accord with Federal law.

§ 1607.7 Use of other validity studies.

A. *Validity studies not conducted by the user.* Users may, under certain circumstances, support the use of selection procedures by validity studies conducted by other users or conducted by

test publishers or distributors and described in test manuals. While publishers of selection procedures have a professional obligation to provide evidence of validity which meets generally accepted professional standards (see section 5C above), users are cautioned that they are responsible for compliance with these guidelines. Accordingly, users seeking to obtain selection procedures from publishers and distributors should be careful to determine that, in the event the user becomes subject to the validity requirements of these guidelines, the necessary information to support validity has been determined and will be made available to the user.

B. *Use of criterion-related validity evidence from other sources.* Criterion-related validity studies conducted by one test user, or described in test manuals and the professional literature, will be considered acceptable for use by another user when the following requirements are met:

(1) *Validity evidence.* Evidence from the available studies meeting the standards of section 14B below clearly demonstrates that the selection procedure is valid;

(2) *Job similarity.* The incumbents in the user's job and the incumbents in the job or group of jobs on which the validity study was conducted perform substantially the same major work behaviors, as shown by appropriate job analyses both on the job or group of jobs on which the validity study was performed and on the job for which the selection procedure is to be used; and

(3) *Fairness evidence.* The studies include a study of test fairness for each race, sex, and ethnic group which constitutes a significant factor in the borrowing user's relevant labor market for the job or jobs in question. If the studies under consideration satisfy paragraphs (1) and (2) of this paragraph B.,¼ above but do not contain an investigation of test fairness, and it is not technically feasible for the borrowing user to conduct an internal study of test fairness, the borrowing user may utilize the study until studies conducted elsewhere meeting the requirements of these guidelines show test unfairness, or until such time as it becomes technically feasible to conduct

an internal study of test fairness and the results of that study can be acted upon. Users obtaining selection procedures from publishers should consider, as one factor in the decision to purchase a particular selection procedure, the availability of evidence concerning test fairness.

C. *Validity evidence from multiunit study.* If validity evidence from a study covering more than one unit within an organization statisfies the requirements of section 14B below, evidence of validity specific to each unit will not be required unless there are variables which are likely to affect validity significantly.

D. *Other significant variables.* If there are variables in the other studies which are likely to affect validity significantly, the user may not rely upon such studies, but will be expected either to conduct an internal validity study or to comply with section 6 above.

### § 1607.8  Cooperative studies.

A. *Encouragement of cooperative studies.* The agencies issuing these guidelines encourage employers, labor organizations, and employment agencies to cooperate in research, development, search for lawful alternatives, and validity studies in order to achieve procedures which are consistent with these guidelines.

B. *Standards for use of cooperative studies.* If validity evidence from a cooperative study satisfies the requirements of section 14 below, evidence of validity specific to each user will not be required unless there are variables in the user's situation which are likely to affect validity significantly.

### § 1607.9  No assumption of validity.

A. *Unacceptable substitutes for evidence of validity.* Under no circumstances will the general reputation of a test or other selection procedures, its author or its publisher, or casual reports of it's validity be accepted in lieu of evidence of validity. Specifically ruled out are: assumptions of validity based on a procedure's name or descriptive labels; all forms of promotional literature; data bearing on the frequency of a procedure's usage; testimonial statements and credentials of sellers, users, or con-

sultants; and other nonempirical or anecdotal accounts of selection practices or selection outcomes.

B. *Encouragement of professional supervision.* Professional supervision of selection activities is encouraged but is not a substitute for documented evidence of validity. The enforcement agencies will take into account the fact that a thorough job analysis was conducted and that careful development and use of a selection procedure in accordance with professional standards enhance the probability that the selection procedure is valid for the job.

### § 1607.10  Employment agencies and employment services.

A. *Where selection procedures are devised by agency.* An employment agency, including private employment agencies and State employment agencies, which agrees to a request by an employer or labor organization to device and utilize a selection procedure should follow the standards in these guidelines for determining adverse impact. If adverse impact exists the agency should comply with these guidelines. An employment agency is not relieved of its obligation herein because the user did not request such validation or has requested the use of some lesser standard of validation than is provided in these guidelines. The use of an employment agency does not relieve an employer or labor organization or other user of its responsibilities under Federal law to provide equal employment opportunity or its obligations as a user under these guidelines.

B. *Where selection procedures are devised elsewhere.* Where an employment agency or service is requested to administer a selection procedure which has been devised elsewhere and to make referrals pursuant to the results, the employment agency or service should maintain and have available evidence of the impact of the selection and referral procedures which it administers. If adverse impact results the agency or service should comply with these guidelines. If the agency or service seeks to comply with these guidelines by reliance upon validity studies or other data in the possession of the employer, it should obtain and have available such information.

### § 1607.11 Disparate treatment.

The principles of disparate or un-equal treatment must be distinguished from the concepts of validation. A selection procedure—even though validated against job performance in accordance with these guidelines—cannot be imposed upon members of a race, sex, or ethnic group where other employees, applicants, or members have not been subjected to that standard. Disparate treatment occurs where members of a race, sex, or ethnic group have been denied the same employment, promotion, membership, or other employment opportunities as have been available to other employees or applicants. Those employees or applicants who have been denied equal treatment, because of prior discriminatory practices or policies, must at least be afforded the same opportunities as had existed for other employees or applicants during the period of discrimination. Thus, the persons who were in the class of persons discriminated against during the period the user followed the discriminatory practices should be allowed the opportunity to qualify under less stringent selection procedures previously followed, unless the user demonstrates that the increased standards are required by business necessity. This section does not prohibit a user who has not previously followed merit standards from adopting merit standards which are in compliance with these guidelines; nor does it preclude a user who has previously used invalid or unvalidated selection procedures from developing and using procedures which are in accord with these guidelines.

### § 1607.12 Retesting of applicants.

Users should provide a reasonable opportunity for retesting and reconsideration. Where examinations are administered periodically with public notice, such reasonable opportunity exists, unless persons who have previously been tested are precluded from retesting. The user may however take reasonable steps to preserve the security of its procedures.

### § 1607.13 Affirmative action.

A. *Affirmative action obligations.* The use of selection procedures which have been validated pursuant to these guidelines does not relieve users of any obligations they may have to undertake affirmative action to assure equal employment opportunity. Nothing in these guidelines is intended to preclude the use of lawful selection procedures which assist in remedying the effects of prior discriminatory practices, or the achievement of affirmative action objectives.

B. *Encouragement of voluntary affirmative action programs.* These guidelines are also intended to encourage the adoption and implementation of voluntary affirmative action programs by users who have no obligation under Federal law to adopt them; but are not intended to impose any new obligations in that regard. The agencies issuing and endorsing these guidelines endorse for all private employers and reaffirm for all governmental employers the Equal Employment Opportunity Coordinating Council's "Policy Statement on Affirmative Action Programs for State and Local Government Agencies" (41 FR 38814, September 13, 1976). That policy statement is attached hereto as appendix, section 17.

TECHNICAL STANDARDS

### § 1607.14 Technical standards for validity studies.

The following minimum standards, as applicable, should be met in conducting a validity study. Nothing in these guidelines is intended to preclude the development and use of other professionally acceptable techniques with respect to validation of selection procedures. Where it is not technically feasible for a user to conduct a validity study, the user has the obligation otherwise to comply with these guidelines. See sections 6 and 7 above.

A. *Validity studies should be based on review of information about the job.* Any validity study should be based upon a review of information about the job for which the selection procedure is to be used. The review should include a job analysis except as provided in section 14B(3) below with respect to criterion-related validity. Any method of job analysis may be used if it provides the information required for the specific validation strategy used.

**Equal Employment Opportunity Comm.** §1607.14

B. *Technical standards for criterion-related validity studies*—(1) *Technical feasibility.* Users choosing to validate a selection procedure by a criterion-related validity strategy should determine whether it is technically feasible (as defined in section 16) to conduct such a study in the particular employment context. The determination of the number of persons necessary to permit the conduct of a meaningful criterion-related study should be made by the user on the basis of all relevant information concerning the selection procedure, the potential sample and the employment situation. Where appropriate, jobs with substantially the same major work behaviors may be grouped together for validity studies, in order to obtain an adequate sample. These guidelines do not require a user to hire or promote persons for the purpose of making it possible to conduct a criterion-related study.

(2) *Analysis of the job.* There should be a review of job information to determine measures of work behavior(s) or performance that are relevant to the job or group of jobs in question. These measures or criteria are relevant to the extent that they represent critical or important job duties, work behaviors or work outcomes as developed from the review of job information. The possibility of bias should be considered both in selection of the criterion measures and their application. In view of the possibility of bias in subjective evaluations, supervisory rating techniques and instructions to raters should be carefully developed. All criterion measures and the methods for gathering data need to be examined for freedom from factors which would unfairly alter scores of members of any group. The relevance of criteria and their freedom from bias are of particular concern when there are significant differences in measures of job performance for different groups.

(3) *Criterion measures.* Proper safeguards should be taken to insure that scores on selection procedures do not enter into any judgments of employee adequacy that are to be used as criterion measures. Whatever criteria are used should represent important or critical work behavior(s) or work outcomes. Certain criteria may be used

without a full job analysis if the user can show the importance of the criteria to the particular employment context. These criteria include but are not limited to production rate, error rate, tardiness, absenteeism, and length of service. A standardized rating of overall work performance may be used where a study of the job shows that it is an appropriate criterion. Where performance in training is used as a criterion, success in training should be properly measured and the relevance of the training should be shown either through a comparison of the content of the training program with the critical or important work behavior(s) of the job(s), or through a demonstration of the relationship between measures of performance in training and measures of job performance. Measures of relative success in training include but are not limited to instructor evaluations, performance samples, or tests. Criterion measures consisting of paper and pencil tests will be closely reviewed for job relevance.

(4) *Representativeness of the sample.* Whether the study is predictive or concurrent, the sample subjects should insofar as feasible be representative of the candidates normally available in the relevant labor market for the job or group of jobs in question, and should insofar as feasible include the races, sexes, and ethnic groups normally available in the relevant job market. In determining the representativeness of the sample in a concurrent validity study, the user should take into account the extent to which the specific knowledges or skills which are the primary focus of the test are those which employees learn on the job.

Where samples are combined or compared, attention should be given to see that such samples are comparable in terms of the actual job they perform, the length of time on the job where time on the job is likely to affect performance, and other relevant factors likely to affect validity differences; or that these factors are included in the design of the study and their effects identified.

(5) *Statistical relationships.* The degree of relationship between selection procedure scores and criterion measures should be examined and computed,

219

using professionally acceptable statistical procedures. Generally, a selection procedure is considered related to the criterion, for the purposes of these guidelines, when the relationship between performance on the procedure and performance on the criterion measure is statistically significant at the 0.05 level of significance, which means that it is sufficiently high as to have a probability of no more than one (1) in twenty (20) to have occurred by chance. Absence of a statistically significant relationship between a selection procedure and job performance should not necessarily discourage other investigations of the validity of that selection procedure.

(6) *Operational use of selection procedures.* Users should evaluate each selection procedure to assure that it is appropriate for operational use, including establishment of cutoff scores or rank ordering. Generally, if other factors reman the same, the greater the magnitude of the relationship (e.g., correlation coefficient) between performance on a selection procedure and one or more criteria of performance on the job, and the greater the importance and number of aspects of job performance covered by the criteria, the more likely it is that the procedure will be appropriate for use. Reliance upon a selection procedure which is significantly related to a criterion measure, but which is based upon a study involving a large number of subjects and has a low correlation coefficient will be subject to close review if it has a large adverse impact. Sole reliance upon a single selection instrument which is related to only one of many job duties or aspects of job performance will also be subject to close review. The appropriateness of a selection procedure is best evaluated in each particular situation and there are no minimum correlation coefficients applicable to all employment situations. In determining whether a selection procedure is appropriate for operational use the following considerations should also be taken into account: The degree of adverse impact of the procedure, the availability of other selection procedures of greater or substantially equal validity.

(7) *Overstatement of validity findings.* Users should avoid reliance upon techniques which tend to overestimate validity findings as a result of capitalization on chance unless an appropriate safeguard is taken. Reliance upon a few selection procedures or criteria of successful job performance when many selection procedures or criteria of performance have been studied, or the use of optimal statistical weights for selection procedures computed in one sample, are techniques which tend to inflate validity estimates as a result of chance. Use of a large sample is one safeguard: cross-validation is another.

(8) *Fairness.* This section generally calls for studies of unfairness where technically feasible. The concept of fairness or unfairness of selection procedures is a developing concept. In addition, fairness studies generally require substantial numbers of employees in the job or group of jobs being studied. For these reasons, the Federal enforcement agencies recognize that the obligation to conduct studies of fairness imposed by the guidelines generally will be upon users or groups of users with a large number of persons in a job class, or test developers; and that small users utilizing their own selection procedures will generally not be obligated to conduct such studies because it will be technically infeasible for them to do so.

(a) *Unfairness defined.* When members of one race, sex, or ethnic group characteristically obtain lower scores on a selection procedure than members of another group, and the differences in scores are not reflected in differences in a measure of job performance, use of the selection procedure may unfairly deny opportunities to members of the group that obtains the lower scores.

(b) *Investigation of fairness.* Where a selection procedure results in an adverse impact on a race, sex, or ethnic group identified in accordance with the classifications set forth in section 4 above and that group is a significant factor in the relevant labor market, the user generally should investigate the possible existence of unfairness for that group if it is technically feasible to do so. The greater the severity of the adverse impact on a group, the greater the need to investigate the possible existence of unfairness. Where the weight of evidence from other studies

**Equal Employment Opportunity Comm.** § 1607.14

shows that the selection procedure predicts fairly for the group in question and for the same or similar jobs, such evidence may be relied on in connection with the selection procedure at issue.

(c) *General considerations in fairness investigations.* Users conducting a study of fairness should review the A.P.A. Standards regarding investigation of possible bias in testing. An investigation of fairness of a selection procedure depends on both evidence of validity and the manner in which the selection procedure is to be used in a particular employment context. Fairness of a selection procedure cannot necessarily be specified in advance without investigating these factors. Investigation of fairness of a selection procedure in samples where the range of scores on selection procedures or criterion measures is severely restricted for any subgroup sample (as compared to other subgroup samples) may produce misleading evidence of unfairness. That factor should accordingly be taken into account in conducting such studies and before reliance is placed on the results.

(d) *When unfairness is shown.* If unfairness is demonstrated through a showing that members of a particular group perform better or poorer on the job than their scores on the selection procedure would indicate through comparison with how members of other groups perform, the user may either revise or replace the selection instrument in accordance with these guidelines, or may continue to use the selection instrument operationally with appropriate revisions in its use to assure compatibility between the probability of successful job performance and the probability of being selected.

(e) *Technical feasibility of fairness studies.* In addition to the general conditions needed for technical feasibility for the conduct of a criterion-related study (see section 16, below) an investigation of fairness requires the following:

(i) An adequate sample of persons in each group available for the study to achieve findings of statistical significance. Guidelines do not require a user to hire or promote persons on the basis of group classifications for the purpose of making it possible to conduct a

study of fairness; but the user has the obligation otherwise to comply with these guidelines.

(ii) The samples for each group should be comparable in terms of the actual job they perform, length of time on the job where time on the job is likely to affect performance, and other relevant factors likely to affect validity differences; or such factors should be included in the design of the study and their effects identified.

(f) *Continued use of selection procedures when fairness studies not feasible.* If a study of fairness should otherwise be performed, but is not technically feasible, a selection procedure may be used which has otherwise met the validity standards of these guidelines, unless the technical infeasibility resulted from discriminatory employment practices which are demonstrated by facts other than past failure to conform with requirements for validation of selection procedures. However, when it becomes technically feasible for the user to perform a study of fairness and such a study is otherwise called for, the user should conduct the study of fairness.

C. *Technical standards for content validity studies*—(1) *Appropriateness of content validity studies.* Users choosing to validate a selection procedure by a content validity strategy should determine whether it is appropriate to conduct such a study in the particular employment context. A selection procedure can be supported by a content validity strategy to the extent that it is a representative sample of the content of the job. Selection procedures which purport to measure knowledges, skills, or abilities may in certain circumstances be justified by content validity, although they may not be representative samples, if the knowledge, skill, or ability measured by the selection procedure can be operationally defined as provided in section 14C(4) below, and if that knowledge, skill, or ability is a necessary prerequisite to successful job performance.

A selection procedure based upon inferences about mental processes cannot be supported solely or primarily on the basis of content validity. Thus, a content strategy is not appropriate for demonstrating the validity of selection procedures which purport to measure

221

traits or constructs, such as intelligence, aptitude, personality, commonsense, judgment, leadership, and spatial ability. Content validity is also not an appropriate strategy when the selection procedure involves knowledges, skills, or abilities which an employee will be expected to learn on the job.

(2) *Job analysis for content validity.* There should be a job analysis which includes an analysis of the important work behavior(s) required for successful performance and their relative importance and, if the behavior results in work product(s), an analysis of the work product(s). Any job analysis should focus on the work behavior(s) and the tasks associated with them. If work behavior(s) are not observable, the job analysis should identify and analyze those aspects of the behavior(s) that can be observed and the observed work products. The work behavior(s) selected for measurement should be critical work behavior(s) and/or important work behavior(s) constituting most of the job.

(3) *Development of selection procedures.* A selection procedure designed to measure the work behavior may be developed specifically from the job and job analysis in question, or may have been previously developed by the user, or by other users or by a test publisher.

(4) *Standards for demonstrating content validity.* To demonstrate the content validity of a selection procedure, a user should show that the behavior(s) demonstrated in the selection procedure are a representative sample of the behavior(s) of the job in question or that the selection procedure provides a representative sample of the work product of the job. In the case of a selection procedure measuring a knowledge, skill, or ability, the knowledge, skill, or ability being measured should be operationally defined. In the case of a selection procedure measuring a knowledge, the knowledge being measured should be operationally defined as that body of learned information which is used in and is a necessary prerequisite for observable aspects of work behavior of the job. In the case of skills or abilities, the skill or ability being measured should be operationally defined in terms of observable aspects of

work behavior of the job. For any selection procedure measuring a knowledge, skill, or ability the user should show that (a) the selection procedure measures and is a representative sample of that knowledge, skill, or ability; and (b) that knowledge, skill, or ability is used in and is a necessary prerequisite to performance of critical or important work behavior(s). In addition, to be content valid, a selection procedure measuring a skill or ability should either closely approximate an observable work behavior, or its product should closely approximate an observable work product. If a test purports to sample a work behavior or to provide a sample of a work product, the manner and setting of the selection procedure and its level and complexity should closely approximate the work situation. The closer the content and the context of the selection procedure are to work samples or work behaviors, the stronger is the basis for showing content validity. As the content of the selection procedure less resembles a work behavior, or the setting and manner of the administration of the selection procedure less resemble the work situation, or the result less resembles a work product, the less likely the selection procedure is to be content valid, and the greater the need for other evidence of validity.

(5) *Reliability.* The reliability of selection procedures justified on the basis of content validity should be a matter of concern to the user. Whenever it is feasible, appropriate statistical estimates should be made of the reliability of the selection procedure.

(6) *Prior training or experience.* A requirement for or evaluation of specific prior training or experience based on content validity, including a specification of level or amount of training or experience, should be justified on the basis of the relationship between the content of the training or experience and the content of the job for which the training or experience is to be required or evaluated. The critical consideration is the resemblance between the specific behaviors, products, knowledges, skills, or abilities in the experience or training and the specific behaviors, products, knowledges, skills, or abilities required on the job, whether

or not there is close resemblance between the experience or training as a whole and the job as a whole.

(7) *Content validity of training success.* Where a measure of success in a training program is used as a selection procedure and the content of a training program is justified on the basis of content validity, the use should be justified on the relationship between the content of the training program and the content of the job.

(8) *Operational use.* A selection procedure which is supported on the basis of content validity may be used for a job if it represents a critical work behavior (i.e., a behavior which is necessary for performance of the job) or work behaviors which constitute most of the important parts of the job.

(9) *Ranking based on content validity studies.* If a user can show, by a job analysis or otherwise, that a higher score on a content valid selection procedure is likely to result in better job performance, the results may be used to rank persons who score above minimum levels. Where a selection procedure supported solely or primarily by content validity is used to rank job candidates, the selection procedure should measure those aspects of performance which differentiate among levels of job performance.

D. *Technical standards for construct validity studies*—(1) *Appropriateness of construct validity studies.* Construct validity is a more complex strategy than either criterion-related or content validity. Construct validation is a relatively new and developing procedure in the employment field, and there is at present a lack of substantial literature extending the concept to employment practices. The user should be aware that the effort to obtain sufficient empirical support for construct validity is both an extensive and arduous effort involving a series of research studies, which include criterion related validity studies and which may include content validity studies. Users choosing to justify use of a selection procedure by this strategy should therefore take particular care to assure that the validity study meets the standards set forth below.

(2) *Job analysis for construct validity studies.* There should be a job analysis.

This job analysis should show the work behavior(s) required for successful performance of the job, or the groups of jobs being studied, the critical or important work behavior(s) in the job or group of jobs being studied, and an identification of the construct(s) believed to underlie successful performance of these critical or important work behaviors in the job or jobs in question. Each construct should be named and defined, so as to distinguish it from other constructs. If a group of jobs is being studied the jobs should have in common one or more critical or important work behav- iors at a comparable level of complexity.

(3) *Relationship to the job.* A selection procedure should then be identified or developed which measures the construct identified in accord with subparagraph (2) above. The user should show by empirical evidence that the selection procedure is validly related to the construct and that the construct is validly related to the performance of critical or important work behavior(s). The relationship between the construct as measured by the selection procedure and the related work behavior(s) should be supported by empirical evidence from one or more criterion-related studies involving the job or jobs in question which satisfy the provisions of section 14B above.

(4) *Use of construct validity study without new criterion-related evidence*—(a) *Standards for use.* Until such time as professional literature provides more guidance on the use of construct validity in employment situations, the Federal agencies will accept a claim of construct validity without a criterion-related study which satisfies section 14B above only when the selection procedure has been used elsewhere in a situation in which a criterion-related study has been conducted and the use of a criterion-related validity study in this context meets the standards for transportability of criterion-related validity studies as set forth above in section 7. However, if a study pertains to a number of jobs having common critical or important work behaviors at a comparable level of complexity, and the evidence satisfies subparagraphs 14B (2) and (3) above for those jobs with criterion-related validity evidence for

those jobs, the selection procedure may be used for all the jobs to which the study pertains. If construct validity is to be generalized to other jobs or groups of jobs not in the group studied, the Federal enforcement agencies will expect at a minimum additional empirical research evidence meeting the standards of subparagraphs section 14B (2) and (3) above for the additional jobs or groups of jobs.

(b) *Determination of common work behaviors.* In determining whether two or more jobs have one or more work behavior(s) in common, the user should compare the observed work behavior(s) in each of the jobs and should compare the observed work product(s) in each of the jobs. If neither the observed work behavior(s) in each of the jobs nor the observed work product(s) in each of the jobs are the same, the Federal enforcement agencies will presume that the work behavior(s) in each job are different. If the work behaviors are not observable, then evidence of similarity of work products and any other relevant research evidence will be considered in determining whether the work behavior(s) in the two jobs are the same.

DOCUMENTATION OF IMPACT AND VALIDITY EVIDENCE

§ 1607.15  Documentation of impact and validity evidence.

A. *Required information.* Users of selection procedures other than those users complying with section 15A(1) below should maintain and have available for each job information on adverse impact of the selection process for that job and, where it is determined a selection process has an adverse impact, evidence of validity as set forth below.

(1) *Simplified recordkeeping for users with less than 100 employees.* In order to minimize recordkeeping burdens on employers who employ one hundred (100) or fewer employees, and other users not required to file EEO–1, et seq., reports, such users may satisfy the requirements of this section 15 if they maintain and have available records showing, for each year:

(a) The number of persons hired, promoted, and terminated for each job, by sex, and where appropriate by race and national origin;

(b) The number of applicants for hire and promotion by sex and where appropriate by race and national origin; and

(c) The selection procedures utilized (either standardized or not standardized).

These records should be maintained for each race or national origin group (see section 4 above) constituting more than two percent (2%) of the labor force in the relevant labor area. However, it is not necessary to maintain records by race and/or national origin (see § 4 above) if one race or national origin group in the relevant labor area constitutes more than ninety-eight percent (98%) of the labor force in the area. If the user has reason to believe that a selection procedure has an adverse impact, the user should maintain any available evidence of validity for that procedure (see sections 7A and 8).

(2) *Information on impact*—(a) *Collection of information on impact.* Users of selection procedures other than those complying with section 15A(1) above should maintain and have available for each job records or other information showing whether the total selection process for that job has an adverse impact on any of the groups for which records are called for by sections 4B above. Adverse impact determinations should be made at least annually for each such group which constitutes at least 2 percent of the labor force in the relevant labor area or 2 percent of the applicable workforce. Where a total selection process for a job has an adverse impact, the user should maintain and have available records or other information showing which components have an adverse impact. Where the total selection process for a job does not have an adverse impact, information need not be maintained for individual components except in circumstances set forth in subsection 15A(2)(b) below. If the determination of adverse impact is made using a procedure other than the "four-fifths rule," as defined in the first sentence of section 4D above, a justification, consistent with section 4D above, for the procedure used to determine adverse impact should be available.

(b) *When adverse impact has been eliminated in the total selection process.* Whenever the total selection process for a particular job has had an adverse impact, as defined in section 4 above, in any year, but no longer has an adverse impact, the user should maintain and have available the information on individual components of the selection process required in the preceding paragraph for the period in which there was adverse impact. In addition, the user should continue to collect such information for at least two (2) years after the adverse impact has been eliminated.

(c) *When data insufficient to determine impact.* Where there has been an insufficient number of selections to determine whether there is an adverse impact of the total selection process for a particular job, the user should continue to collect, maintain and have available the information on individual components of the selection process required in section 15(A)(2)(a) above until the information is sufficient to determine that the overall selection process does not have an adverse impact as defined in section 4 above, or until the job has changed substantially.

(3) *Documentation of validity evidence*—(a) *Types of evidence.* Where a total selection process has an adverse impact (see section 4 above) the user should maintain and have available for each component of that process which has an adverse impact, one or more of the following types of documentation evidence:

(i) Documentation evidence showing criterion-related validity of the selection procedure (see section 15B, below).

(ii) Documentation evidence showing content validity of the selection procedure (see section 15C, below).

(iii) Documentation evidence showing construct validity of the selection procedure (see section 15D, below).

(iv) Documentation evidence from other studies showing validity of the selection procedure in the user's facility (see section 15E, below).

(v) Documentation evidence showing why a validity study cannot or need not be performed and why continued use of the procedure is consistent with Federal law.

(b) *Form of report.* This evidence should be compiled in a reasonably complete and organized manner to permit direct evaluation of the validity of the selection procedure. Previously written employer or consultant reports of validity, or reports describing validity studies completed before the issuance of these guidelines are acceptable if they are complete in regard to the documentation requirements contained in this section, or if they satisfied requirements of guidelines which were in effect when the validity study was completed. If they are not complete, the required additional documentation should be appended. If necessary information is not available the report of the validity study may still be used as documentation, but its adequacy will be evaluated in terms of compliance with the requirements of these guidelines.

(c) *Completeness.* In the event that evidence of validity is reviewed by an enforcement agency, the validation reports completed after the effective date of these guidelines are expected to contain the information set forth below. Evidence denoted by use of the word "(Essential)" is considered critical. If information denoted essential is not included, the report will be considered incomplete unless the user affirmatively demonstrates either its unavailability due to circumstances beyond the user's control or special circumstances of the user's study which make the information irrelevant. Evidence not so denoted is desirable but its absence will not be a basis for considering a report incomplete. The user should maintain and have available the information called for under the heading "Source Data" in sections 15B(11) and 15D(11). While it is a necessary part of the study, it need not be submitted with the report. All statistical results should be organized and presented in tabular or graphic form to the extent feasible.

B. *Criterion-related validity studies.* Reports of criterion-related validity for a selection procedure should include the following information:

(1) *User(s), location(s), and date(s) of study.* Dates and location(s) of the job analysis or review of job information,

the date(s) and location(s) of the administration of the selection procedures and collection of criterion data, and the time between collection of data on selection procedures and criterion measures should be provided (Essential). If the study was conducted at several locations, the address of each location, including city and State, should be shown.

(2) *Problem and setting.* An explicit definition of the purpose(s) of the study and the circumstances in which the study was conducted should be provided. A description of existing selection procedures and cutoff scores, if any, should be provided.

(3) *Job anlysis or review of job information.* A description of the procedure used to analyze the job or group of jobs, or to review the job information should be provided (Essential). Where a review of job information results in criteria which may be used without a full job analysis (see section 14B(3)), the basis for the selection of these criteria should be reported (Essential). Where a job analysis is required a complete description of the work behavior(s) or work outcome(s), and measures of their criticality or importance should be provided (Essential). The report should describe the basis on which the behavior(s) or outcome(s) were determined to be critical or important, such as the proportion of time spent on the respective behaviors, their level of difficulty, their frequency of performance, the consequences of error, or other appropriate factors (Essential). Where two or more jobs are grouped for a validity study, the information called for in this subsection should be provided for each of the jobs, and the justification for the grouping (see section 14B(1)) should be provided (Essential).

(4) *Job titles and codes.* It is desirable to provide the user's job title(s) for the job(s) in question and the corresponding job title(s) and code(s) from U.S. Employment Service's Dictionary of Occupational Titles.

(5) *Criterion measures.* The bases for the selection of the criterion measures should be provided, together with references to the evidence considered in making the selection of criterion measures (essential). A full description of all criteria on which data were col-

lected and means by which they were observed, recorded, evaluated, and quantified, should be provided (essential). If rating techniques are used as criterion measures, the appraisal form(s) and instructions to the rater(s) should be included as part of the validation evidence, or should be explicitly described and available (essential). All steps taken to insure that criterion measures are free from factors which would unfairly alter the scores of members of any group should be described (essential).

(6) *Sample description.* A description of how the research sample was identified and selected should be included (essential). The race, sex, and ethnic composition of the sample, including those groups set forth in section 4A above, should be described (essential). This description should include the size of each subgroup (essential). A description of how the research sample compares with the relevant labor market or work force, the method by which the relevant labor market or work force was defined, and a discussion of the likely effects on validity of differences between the sample and the relevant labor market or work force, are also desirable. Descriptions of educational levels, length of service, and age are also desirable.

(7) *Description of selection procedures.* Any measure, combination of measures, or procedure studied should be completely and explicitly described or attached (essential). If commercially available selection procedures are studied, they should be described by title, form, and publisher (essential). Reports of reliability estimates and how they were established are desirable.

(8) *Techniques and results.* Methods used in analyzing data should be described (essential). Measures of central tendency (e.g., means) and measures of dispersion (e.g., standard deviations and ranges) for all selection procedures and all criteria should be reported for each race, sex, and ethnic group which constitutes a significant factor in the relevant labor market (essential). The magnitude and direction of all relationships between selection procedures and criterion measures investigated should be reported for each relevant race, sex, and ethnic group and for the

total group (essential). Where groups are too small to obtain reliable evidence of the magnitude of the relationship, need not be reported separately. Statements regarding the statistical significance of results should be made (essential). Any statistical adjustments, such as for less then perfect reliability or for restriction of score range in the selection procedure or criterion should be described and explained; and uncorrected correlation coefficients should also be shown (essential). Where the statistical technique categorizes continuous data, such as biserial correlation and the phi coefficient, the categories and the bases on which they were determined should be described and explained (essential). Studies of test fairness should be included where called for by the requirements of section 14B(8) (essential). These studies should include the rationale by which a selection procedure was determined to be fair to the group(s) in question. Where test fairness or unfairness has been demonstrated on the basis of other studies, a bibliography of the relevant studies should be included (essential). If the bibliography includes unpublished studies, copies of these studies, or adequate abstracts or summaries, should be attached (essential). Where revisions have been made in a selection procedure to assure compatability between successful job performance and the probability of being selected, the studies underlying such revisions should be included (essential). All statistical results should be organized and presented by relevant race, sex, and ethnic group (essential).

(9) *Alternative procedures investigated.* The selection procedures investigated and available evidence of their impact should be identified (essential). The scope, method, and findings of the investigation, and the conclusions reached in light of the findings, should be fully described (essential).

(10) *Uses and applications.* The methods considered for use of the selection procedure (e.g., as a screening device with a cutoff score, for grouping or ranking, or combined with other procedures in a battery) and available evidence of their impact should be described (essential). This description

should include the rationale for choosing the method for operational use, and the evidence of the validity and utility of the procedure as it is to be used (essential). The purpose for which the procedure is to be used (e.g., hiring, transfer, promotion) should be described (essential). If weights are assigned to different parts of the selection procedure, these weights and the validity of the weighted composite should be reported (essential). If the selection procedure is used with a cutoff score, the user should describe the way in which normal expectations of proficiency within the work force were determined and the way in which the cutoff score was determined (essential).

(11) *Source data.* Each user should maintain records showing all pertinent information about individual sample members and raters where they are used, in studies involving the validation of selection procedures. These records should be made available upon request of a compliance agency. In the case of individual sample members these data should include scores on the selection procedure(s), scores on criterion measures, age, sex, race, or ethnic group status, and experience on the specific job on which the validation study was conducted, and may also include such things as education, training, and prior job experience, but should not include names and social security numbers. Records should be maintained which show the ratings given to each sample member by each rater.

(12) *Contact person.* The name, mailing address, and telephone number of the person who may be contacted for further information about the validity study should be provided (essential).

(13) *Accuracy and completeness.* The report should describe the steps taken to assure the accuracy and completeness of the collection, analysis, and report of data and results.

C. *Content validity studies.* Reports of content validity for a selection procedure should include the following information:

(1) *User(s), location(s) and date(s) of study.* Dates and location(s) of the job analysis should be shown (essential).

(2) *Problem and setting.* An explicit definition of the purpose(s) of the study

and the circumstances in which the study was conducted should be provided. A description of existing selection procedures and cutoff scores, if any, should be provided.

(3) *Job analysis—Content of the job.* A description of the method used to analyze the job should be provided (essential). The work behavior(s), the associated tasks, and, if the behavior results in a work product, the work products should be completely described (essential). Measures of criticality and/or importance of the work behavior(s) and the method of determining these measures should be provided (essential). Where the job analysis also identified the knowledges, skills, and abilities used in work behavior(s), an operational definition for each knowledge in terms of a body of learned information and for each skill and ability in terms of observable behaviors and outcomes, and the relationship between each knowledge, skill, or ability and each work behavior, as well as the method used to determine this relationship, should be provided (essential). The work situation should be described, including the setting in which work behavior(s) are performed, and where appropriate, the manner in which knowledges, skills, or abilities are used, and the complexity and difficulty of the knowledge, skill, or ability as used in the work behavior(s).

(4) *Selection procedure and its content.* Selection procedures, including those constructed by or for the user, specific training requirements, composites of selection procedures, and any other procedure supported by content validity, should be completely and explicitly described or attached (essential). If commercially available selection procedures are used, they should be described by title, form, and publisher (essential). The behaviors measured or sampled by the selection procedure should be explicitly described (essential). Where the selection procedure purports to measure a knowledge, skill, or ability, evidence that the selection procedure measures and is a representative sample of the knowledge, skill, or ability should be provided (essential).

(5) *Relationship between the selection procedure and the job.* The evidence demonstrating that the selection procedure is a representative work sample, a representative sample of the work behavior(s), or a representative sample of a knowledge, skill, or ability as used as a part of a work behavior and necessary for that behavior should be provided (essential). The user should identify the work behavior(s) which each item or part of the selection procedure is intended to sample or measure (essential). Where the selection procedure purports to sample a work behavior or to provide a sample of a work product, a comparison should be provided of the manner, setting, and the level of complexity of the selection procedure with those of the work situation (essential). If any steps were taken to reduce adverse impact on a race, sex, or ethnic group in the content of the procedure or in its administration, these steps should be described. Establishment of time limits, if any, and how these limits are related to the speed with which duties must be performed on the job, should be explained. Measures of central tend- ency (e.g., means) and measures of dispersion (e.g., standard deviations) and estimates of reliability should be reported for all selection procedures if available. Such reports should be made for relevant race, sex, and ethnic subgroups, at least on a statistically reliable sample basis.

(6) *Alternative procedures investigated.* The alternative selection procedures investigated and available evidence of their impact should be identified (essential). The scope, method, and findings of the investigation, and the conclusions reached in light of the findings, should be fully described (essential).

(7) *Uses and applications.* The methods considered for use of the selection procedure (e.g., as a screening device with a cutoff score, for grouping or ranking, or combined with other procedures in a battery) and available evidence of their impact should be described (essential). This description should include the rationale for choosing the method for operational use, and the evidence of the validity and utility of the procedure as it is to be used (essential). The purpose for which the procedure is to be used (e.g., hiring, transfer, promotion) should be described (essential). If the selection procedure is used with

a cutoff score, the user should describe the way in which normal expectations of proficiency within the work force were determined and the way in which the cutoff score was determined (essential). In addition, if the selection procedure is to be used for ranking, the user should specify the evidence showing that a higher score on the selection procedure is likely to result in better job performance.

(8) *Contact person.* The name, mailing address, and telephone number of the person who may be contacted for further information about the validity study should be provided (essential).

(9) *Accuracy and completeness.* The report should describe the steps taken to assure the accuracy and completeness of the collection, analysis, and report of data and results.

D. *Construct validity studies.* Reports of construct validity for a selection procedure should include the following information:

(1) *User(s), location(s), and date(s) of study.* Date(s) and location(s) of the job analysis and the gathering of other evidence called for by these guidelines should be provided (essential).

(2) *Problem and setting.* An explicit definition of the purpose(s) of the study and the circumstances in which the study was conducted should be provided. A description of existing selection procedures and cutoff scores, if any, should be provided.

(3) *Construct definition.* A clear definition of the construct(s) which are believed to underlie successful performance of the critical or important work behavior(s) should be provided (essential). This definition should include the levels of construct performance relevant to the job(s) for which the selection procedure is to be used (essential). There should be a summary of the position of the construct in the psychological literature, or in the absence of such a position, a description of the way in which the definition and measurement of the construct was developed and the psychological theory underlying it (essential). Any quantitative data which identify or define the job constructs, such as factor analyses, should be provided (essential).

(4) *Job analysis.* A description of the method used to analyze the job should

be provided (essential). A complete description of the work behavior(s) and, to the extent appropriate, work outcomes and measures of their criticality and/or importance should be provided (essential). The report should also describe the basis on which the behavior(s) or outcomes were determined to be important, such as their level of difficulty, their frequency of performance, the consequences of error or other appropriate factors (essential). Where jobs are grouped or compared for the purposes of generalizing validity evidence, the work behavior(s) and work product(s) for each of the jobs should be described, and conclusions concerning the similarity of the jobs in terms of observable work behaviors or work products should be made (essential).

(5) *Job titles and codes.* It is desirable to provide the selection procedure user's job title(s) for the job(s) in question and the corresponding job title(s) and code(s) from the United States Employment Service's dictionary of occupational titles.

(6) *Selection procedure.* The selection procedure used as a measure of the construct should be completely and explicitly described or attached (essential). If commercially available selection procedures are used, they should be identified by title, form and publisher (essential). The research evidence of the relationship between the selection procedure and the construct, such as factor structure, should be included (essential). Measures of central tendency, variability and reliability of the selection procedure should be provided (essential). Whenever feasible, these measures should be provided separately for each relevant race, sex and ethnic group.

(7) *Relationship to job performance.* The criterion-related study(ies) and other empirical evidence of the relationship between the construct measured by the selection procedure and the related work behavior(s) for the job or jobs in question should be provided (essential). Documentation of the criterion-related study(ies) should satisfy the provisions of section 15B above or section 15E(1) below, except for studies conducted prior to the effective date of these guidelines (essential). Where a

study pertains to a group of jobs, and, on the basis of the study, validity is asserted for a job in the group, the observed work behaviors and the observed work products for each of the jobs should be described (essential). Any other evidence used in determining whether the work behavior(s) in each of the jobs is the same should be fully described (essential).

(8) *Alternative procedures investigated.* The alternative selection procedures investigated and available evidence of their impact should be identified (essential). The scope, method, and findings of the investigation, and the conclusions reached in light of the findings should be fully described (essential).

(9) *Uses and applications.* The methods considered for use of the selection procedure (e.g., as a screening device with a cutoff score, for grouping or ranking, or combined with other procedures in a battery) and available evidence of their impact should be described (essential). This description should include the rationale for choosing the method for operational use, and the evidence of the validity and utility of the procedure as it is to be used (essential). The purpose for which the procedure is to be used (e.g., hiring, transfer, promotion) should be described (essential). If weights are assigned to different parts of the selection procedure, these weights and the validity of the weighted composite should be reported (essential). If the selection procedure is used with a cutoff score, the user should describe the way in which normal expectations of proficiency within the work force were determined and the way in which the cutoff score was determined (essential).

(10) *Accuracy and completeness.* The report should describe the steps taken to assure the accuracy and completeness of the collection, analysis, and report of data and results.

(11) *Source data.* Each user should maintain records showing all pertinent information relating to its study of construct validity.

(12) *Contact person.* The name, mailing address, and telephone number of the individual who may be contacted for further information about the validity study should be provided (essential).

E. *Evidence of validity from other studies.* When validity of a selection procedure is supported by studies not done by the user, the evidence from the original study or studies should be compiled in a manner similar to that required in the appropriate section of this section 15 above. In addition, the following evidence should be supplied:

(1) *Evidence from criterion-related validity studies*—a. *Job information.* A description of the important job behavior(s) of the user's job and the basis on which the behaviors were determined to be important should be provided (essential). A full description of the basis for determining that these important work behaviors are the same as those of the job in the original study (or studies) should be provided (essential).

b. *Relevance of criteria.* A full description of the basis on which the criteria used in the original studies are determined to be relevant for the user should be provided (essential).

c. *Other variables.* The similarity of important applicant pool or sample characteristics reported in the original studies to those of the user should be described (essential). A description of the comparison between the race, sex and ethnic composition of the user's relevant labor market and the sample in the original validity studies should be provided (essential).

d. *Use of the selection procedure.* A full description should be provided showing that the use to be made of the selection procedure is consistent with the findings of the original validity studies (essential).

e. *Bibliography.* A bibliography of reports of validity of the selection procedure for the job or jobs in question should be provided (essential). Where any of the studies included an investigation of test fairness, the results of this investigation should be provided (essential). Copies of reports published in journals that are not commonly available should be described in detail or attached (essential). Where a user is relying upon unpublished studies, a reasonable effort should be made to obtain these studies. If these unpublished studies are the sole source of validity evidence they should be described in detail or attached (essential). If these studies are not available, the name and

address of the source, an adequate abstract or summary of the validity study and data, and a contact person in the source organization should be provided (essential).

(2) *Evidence from content validity studies.* See section 14C(3) and section 15C above.

(3) *Evidence from construct validity studies.* See sections 14D(2) and 15D above.

F. *Evidence of validity from cooperative studies.* Where a selection procedure has been validated through a cooperative study, evidence that the study satisfies the requirements of sections 7, 8 and 15E should be provided (essential).

G. *Selection for higher level job.* If a selection procedure is used to evaluate candidates for jobs at a higher level than those for which they will initially be employed, the validity evidence should satisfy the documentation provisions of this section 15 for the higher level job or jobs, and in addition, the user should provide: (1) a description of the job progression structure, formal or informal; (2) the data showing how many employees progress to the higher level job and the length of time needed to make this progression; and (3) an identification of any anticipated changes in the higher level job. In addition, if the test measures a knowledge, skill or ability, the user should provide evidence that the knowledge, skill or ability is required for the higher level job and the basis for the conclusion that the knowledge, skill or ability is not expected to develop from the training or experience on the job.

H. *Interim use of selection procedures.* If a selection procedure is being used on an interim basis because the procedure is not fully supported by the required evidence of validity, the user should maintain and have available (1) substantial evidence of validity for the procedure, and (2) a report showing the date on which the study to gather the additional evidence commenced, the estimated completion date of the study,

and a description of the data to be collected (essential).

(Approved by the Office of Management and Budget under control number 3046–0017)

(Pub. L. 96–511, 94 Stat. 2812 (44 U.S.C. 3501 *et seq.*))

[43 FR 38295, 38312, Aug. 25, 1978, as amended at 46 FR 63268, Dec. 31, 1981]

DEFINITIONS

**§ 1607.16  Definitions.**

The following definitions shall apply throughout these guidelines:

A. *Ability.* A present competence to perform an observable behavior or a behavior which results in an observable product.

B. *Adverse impact.* A substantially different rate of selection in hiring, promotion, or other employment decision which works to the disadvantage of members of a race, sex, or ethnic group. See section 4 of these guidelines.

C. *Compliance with these guidelines.* Use of a selection procedure is in compliance with these guidelines if such use has been validated in accord with these guidelines (as defined below), or if such use does not result in adverse impact on any race, sex, or ethnic group (see section 4, above), or, in unusual circumstances, if use of the procedure is otherwise justified in accord with Federal law. See section 6B, above.

D. *Content validity.* Demonstrated by data showing that the content of a selection procedure is representative of important aspects of performance on the job. See section 5B and section 14C.

E. *Construct validity.* Demonstrated by data showing that the selection procedure measures the degree to which candidates have identifiable characteristics which have been determined to be important for successful job performance. See section 5B and section 14D.

F. *Criterion-related validity.* Demonstrated by empirical data showing that the selection procedure is predictive of or significantly correlated with important elements of work behavior. See sections 5B and 14B.

G. *Employer.* Any employer subject to the provisions of the Civil Rights Act of 1964, as amended, including State or local governments and any Federal

agency subject to the provisions of section 717 of the Civil Rights Act of 1964, as amended, and any Federal contractor or subcontractor or federally assisted construction contractor or subcontractor covered by Executive Order 11246, as amended.

H. *Employment agency.* Any employment agency subject to the provisions of the Civil Rights Act of 1964, as amended.

I. *Enforcement action.* For the purposes of section 4 a proceeding by a Federal enforcement agency such as a lawsuit or an administrative proceeding leading to debarment from or withholding, suspension, or termination of Federal Government contracts or the suspension or withholding of Federal Government funds; but not a finding of reasonable cause or a conciliation process or the issuance of right to sue letters under title VII or under Executive Order 11246 where such finding, conciliation, or issuance of notice of right to sue is based upon an individual complaint.

J. *Enforcement agency.* Any agency of the executive branch of the Federal Government which adopts these guidelines for purposes of the enforcement of the equal employment opportunity laws or which has responsibility for securing compliance with them.

K. *Job analysis.* A detailed statement of work behaviors and other information relevant to the job.

L. *Job description.* A general statement of job duties and responsibilities.

M. *Knowledge.* A body of information applied directly to the performance of a function.

N. *Labor organization.* Any labor organization subject to the provisions of the Civil Rights Act of 1964, as amended, and any committee subject thereto controlling apprenticeship or other training.

O. *Observable.* Able to be seen, heard, or otherwise perceived by a person other than the person performing the action.

P. *Race, sex, or ethnic group.* Any group of persons identifiable on the grounds of race, color, religion, sex, or national origin.

Q. *Selection procedure.* Any measure, combination of measures, or procedure used as a basis for any employment de-

cision. Selection procedures include the full range of assessment techniques from traditional paper and pencil tests, performance tests, training programs, or probationary periods and physical, educational, and work experience requirements through informal or casual interviews and unscored application forms.

R. *Selection rate.* The proportion of applicants or candidates who are hired, promoted, or otherwise selected.

S. *Should.* The term "should" as used in these guidelines is intended to connote action which is necessary to achieve compliance with the guidelines, while recognizing that there are circumstances where alternative courses of action are open to users.

T. *Skill.* A present, observable competence to perform a learned psychomoter act.

U. *Technical feasibility.* The existence of conditions permitting the conduct of meaningful criterion-related validity studies. These conditions include: (1) An adequate sample of persons available for the study to achieve findings of statistical significance; (2) having or being able to obtain a sufficient range of scores on the selection procedure and job performance measures to produce validity results which can be expected to be representative of the results if the ranges normally expected were utilized; and (3) having or being able to devise unbiased, reliable and relevant measures of job performance or other criteria of employee adequacy. See section 14B(2). With respect to investigation of possible unfairness, the same considerations are applicable to each group for which the study is made. See section 14B(8).

V. *Unfairness of selection procedure.* A condition in which members of one race, sex, or ethnic group characteristically obtain lower scores on a selection procedure than members of another group, and the differences are not reflected in differences in measures of job performance. See section 14B(7).

W. *User.* Any employer, labor organization, employment agency, or licensing or certification board, to the extent it may be covered by Federal equal employment opportunity law, which uses a selection procedure as a basis for any

employment decision. Whenever an employer, labor organization, or employment agency is required by law to restrict recruitment for any occupation to those applicants who have met licensing or certification requirements, the licensing or certifying authority to the extent it may be covered by Federal equal employment opportunity law will be considered the user with respect to those licensing or certification requirements. Whenever a State employment agency or service does no more than administer or monitor a procedure as permitted by Department of Labor regulations, and does so without making referrals or taking any other action on the basis of the results, the State employment agency will not be deemed to be a user.

X. *Validated in accord with these guidelines or properly validated.* A demonstration that one or more validity study or studies meeting the standards of these guidelines has been conducted, including investigation and, where appropriate, use of suitable alternative selection procedures as contemplated by section 3B, and has produced evidence of validity sufficient to warrant use of the procedure for the intended purpose under the standards of these guidelines.

Y. *Work behavior.* An activity performed to achieve the objectives of the job. Work behaviors involve observable (physical) components and unobservable (mental) components. A work behavior consists of the performance of one or more tasks. Knowledges, skills, and abilities are not behaviors, although they may be applied in work behaviors.

#### APPENDIX

#### § 1607.17  Policy statement on affirmative action (see section 13B).

The Equal Employment Opportunity Coordinating Council was established by act of Congress in 1972, and charged with responsibility for developing and implementing agreements and policies designed, among other things, to eliminate conflict and inconsistency among the agencies of the Federal Government responsible for administering Federal law prohibiting discrimination on grounds of race, color, sex, religion,

and national origin. This statement is issued as an initial response to the requests of a number of State and local officials for clarification of the Government's policies concerning the role of affirmative action in the overall equal employment opportunity program. While the Coordinating Council's adoption of this statement expresses only the views of the signatory agencies concerning this important subject, the principles set forth below should serve as policy guidance for other Federal agencies as well.

(1) Equal employment opportunity is the law of the land. In the public sector of our society this means that all persons, regardless of race, color, religion, sex, or national origin shall have equal access to positions in the public service limited only by their ability to do the job. There is ample evidence in all sectors of our society that such equal access frequently has been denied to members of certain groups because of their sex, racial, or ethnic characteristics. The remedy for such past and present discrimination is twofold.

On the one hand, vigorous enforcement of the laws against discrimination is essential. But equally, and perhaps even more important are affirmative, voluntary efforts on the part of public employers to assure that positions in the public service are genuinely and equally accessible to qualified persons, without regard to their sex, racial, or ethnic characteristics. Without such efforts equal employment opportunity is no more than a wish. The importance of voluntary affirmative action on the part of employers is underscored by title VII of the Civil Rights Act of 1964, Executive Order 11246, and related laws and regulations—all of which emphasize voluntary action to achieve equal employment opportunity.

As with most management objectives, a systematic plan based on sound organizational analysis and problem identification is crucial to the accomplishment of affirmative action objectives. For this reason, the Council urges all State and local governments to develop and implement results oriented affirmative action plans which deal with the problems so identified.

The following paragraphs are intended to assist State and local governments by illustrating the kinds of analyses and activities which may be appropriate for a public employer's voluntary affirmative action plan. This statement does not address remedies imposed after a finding of unlawful discrimination.

(2) Voluntary affirmative action to assure equal employment opportunity is appropriate at any stage of the employment process. The first step in the construction of any affirmative action plan should be an analysis of the employer's work force to determine whether percentages of sex, race, or ethnic groups in individual job classifications are substantially similar to the precentages of those groups available in the relevant job market who possess the basic job-related qualifications.

When substantial disparities are found through such analyses, each element of the overall selection process should be examined to determine which elements operate to exclude persons on the basis of sex, race, or ethnic group. Such elements include, but are not limited to, recruitment, testing, ranking certification, interview, recommendations for selection, hiring, promotion, etc. The examination of each element of the selection process should at a minimum include a determination of its validity in predicting job performance.

(3) When an employer has reason to believe that its selection procedures have the exclusionary effect described in paragraph 2 above, it should initiate affirmative steps to remedy the situation. Such steps, which in design and execution may be race, color, sex, or ethnic "conscious," include, but are not limited to, the following:

(a) The establishment of a long-term goal, and short-range, interim goals and timetables for the specific job classifications, all of which should take into account the availability of basically qualified persons in the relevant job market;

(b) A recruitment program designed to attract qualified members of the group in question;

(c) A systematic effort to organize work and redesign jobs in ways that provide opportunities for persons lacking "journeyman" level knowledge or skills to enter and, with appropriate training, to progress in a career field;

(d) Revamping selection instruments or procedures which have not yet been validated in order to reduce or eliminate exclusionary effects on particular groups in particular job classifications;

(e) The initiation of measures designed to assure that members of the affected group who are qualified to perform the job are included within the pool of persons from which the selecting official makes the selection;

(f) A systematic effort to provide career advancement training, both classroom and on-the-job, to employees locked into dead end jobs; and

(g) The establishment of a system for regularly monitoring the effectiveness of the particular affirmative action program, and procedures for making timely adjustments in this program where effectiveness is not demonstrated.

(4) The goal of any affirmative action plan should be achievement of genuine equal employment opportunity for all qualified persons. Selection under such plans should be based upon the ability of the applicant(s) to do the work. Such plans should not require the selection of the unqualified, or the unneeded, nor should they require the selection of persons on the basis of race, color, sex, religion, or national origin. Moreover, while the Council believes that this statement should serve to assist State and local employers, as well as Federal agencies, it recognizes that affirmative action cannot be viewed as a standardized program which must be accomplished in the same way at all times in all places.

Accordingly, the Council has not attempted to set forth here either the minimum or maximum voluntary steps that employers may take to deal with their respective situations. Rather, the Council recognizes that under applicable authorities, State and local employers have flexibility to formulate affirmative action plans that are best suited to their particular situations. In this manner, the Council believes that affirmative action programs will best serve the goal of equal employment opportunity.

Respectfully submitted,

Harold R. Tyler, Jr.,
Deputy Attorney General and Chairman
of the Equal Employment Coordinating
Council.

Michael H. Moskow,
Under Secretary of Labor.

Ethel Bent Walsh,
Acting Chairman, Equal Employment
Opportunity Commission.

Robert E. Hampton,
Chairman, Civil Service Commission.

Arthur E. Flemming,
Chairman, Commission on Civil Rights.

Because of its equal employment opportunity responsibilities under the State and Local Government Fiscal Assistance Act of 1972 (the revenue sharing act), the Department of Treasury was invited to participate in the formulation of this policy statement; and it concurs and joins in the adoption of this policy statement.

Done this 26th day of August 1976.

Richard Albrecht,
General Counsel,
Department of the Treasury.

§ 1607.18   Citations.

The official title of these guidelines is "Uniform Guidelines on Employee Selection Procedures (1978)". The Uniform Guidelines on Employee Selection Procedures (1978) are intended to establish a uniform Federal position in the area of prohibiting discrimination in employment practices on grounds of race, color, religion, sex, or national origin. These guidelines have been adopted by the Equal Employment Opportunity Commission, the Department of Labor, the Department of Justice, and the Civil Service Commission.

The official citation is:

Section ___, Uniform Guidelines on Employee Selection Procedure (1978); 43 FR ___ (August 25, 1978).

The short form citation is:

Section ___, U.G.E.S.P. (1978); 43 FR ___ (August 25, 1978).

When the guidelines are cited in connection with the activities of one of the issuing agencies, a specific citation to the regulations of that agency can be added at the end of the above citation. The specific additional citations are as follows:

Equal Employment Opportunity Commission
29 CFR part 1607
Department of Labor
Office of Federal Contract Compliance Programs
41 CFR part 60–3
Department of Justice
28 CFR 50.14
Civil Service Commission
5 CFR 300.103(c)

Normally when citing these guidelines, the section number immediately preceding the title of the guidelines will be from these guidelines series 1–18. If a section number from the codification for an individual agency is needed it can also be added at the end of the agency citation. For example, section 6A of these guidelines could be cited for EEOC as follows:

Section 6A, Uniform Guidelines on Employee Selection Procedures (1978); 43 FR ___, (August 25, 1978); 29 CFR part 1607, section 6A.

## PART 1608—AFFIRMATIVE ACTION APPROPRIATE UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED

Sec.
1608.1   Statement of purpose.
1608.2   Written interpretation and opinion.
1608.3   Circumstances under which voluntary affirmative action is appropriate.
1608.4   Establishing affirmative action plans.
1608.5   Affirmative action compliance programs under Executive Order No. 11246, as amended.
1608.6   Affirmative action plans which are part of Commission conciliation or settlement agreements.
1608.7   Affirmative action plans or programs under State or local law.
1608.8   Adherence to court order.
1608.9   Reliance on directions of other government agencies.
1608.10  Standard of review.
1608.11  Limitations on the application of these guidelines.
1608.12  Equal employment opportunity plans adopted pursuant to section 717 of title VII.

AUTHORITY: Sec. 713 the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e–12, 78 Stat. 265.

SOURCE: 44 FR 4422, Jan. 19, 1979, unless otherwise noted.